**UNITED STATES of America,**
**Plaintiff,**

v.

**ELCOM LTD., a/k/a Elcomsoft Co., Ltd. and Dmitry Sklyarov, Defendants.**

**No. CR.01–20138 RMW.**

United States District Court, N.D. California, San Jose Division.

May 8, 2002.

Scott Frewing, Assistant United States Attorney, San Jose, CA, for Plaintiff.

Joseph M. Burton, Stephen H. Sutro, Duane Morris LLP, San Francisco, CA, for Defendant Elcomsoft.

John Keker, Daralyn J. Durie, Michael D. Celio, Keker & Van Nest, San Francisco, CA, Specially Appearing as Of Counsel for Defendant.

## ORDER DENYING DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT ON CONSTITUTIONAL GROUNDS

WHYTE, District Judge.

On April 1, 2002, the court heard defendant Elcom Ltd.'s motions to dismiss the indictment for violation of due process and on First Amendment grounds. The government opposed the motions. The court has considered the papers submitted by the parties and amici curiae and had the benefit of oral argument on the motions, and for the reasons set forth below, defendant's motions to dismiss the indictment are denied.

## BACKGROUND

1. *The Technology: eBooks and the AEBPR*

Adobe Systems is a software company headquartered in San Jose, California. Adobe's Acrobat eBook Reader product provides the technology for the reading of books in digital form (*i.e.*, electronic books, or "ebooks") on personal computers. Use of the Adobe eBook format allows publish-

ers or distributors of electronic books to control the subsequent distribution of the ebook, typically by limiting the distribution to those who pay for a copy. Diaz Decl. ¶ 5. These restrictions are imposed by the publisher's use of the Adobe Content Server, which allows the publisher to grant or withhold a range of privileges from the consumer. For example, the ebook publisher may choose whether the consumer will be able to copy the ebook, whether the ebook can be printed to paper (in whole, in part, or not at all), whether the "lending function" is enabled to allow the user to lend the ebook to another computer on the same network of computers, and whether to permit the ebook to be read audibly by a speech synthesizer program. *Id.* ¶ 8. When a consumer purchases an ebook formatted for Adobe Acrobat eBook Reader from an Internet website, the ebook is downloaded directly to the consumer's computer from the ebook distributor's Adobe Content Server.[1] The ebook is accompanied by an electronic "voucher" which is recognized and read by the Adobe Acrobat eBook Reader,[2] which then "knows" that the copy of the ebook can only be read on the computer onto which it has been downloaded. *Id.* ¶ 9. Thus, typically, the purchaser of an ebook may only read the ebook on the computer onto which the ebook was downloaded but may not e-mail or copy the ebook to another computer. The user may or may not be able to print the ebook in paper form or have it audibly read by the computer. *Id.* ¶¶ 5–9.

The indictment alleges that "[w]hen an ebook purchased for viewing in the Adobe eBook Reader format was sold by the publisher or distributor, the publisher or distributor of the ebook could authorize or limit the purchaser's ability to copy, distribute, print, or have the text read audibly by the computer. Adobe designed the eBook Reader to permit the management of such digital rights so that in the ordinary course of its operation, the eBook Reader effectively permitted the publisher or distributor of the ebook to restrict or limit the exercise of certain copyright rights of an owner of the copyright for an ebook distributed in the eBook Reader format." Indictment ¶ 1(g).

Defendant Elcomsoft Company Ltd. ("Elcomsoft") developed and sold a product known as the Advanced eBook Processor ("AEBPR"). AEBPR is a Windows-based software program that allows a user to remove use restrictions from Adobe Acrobat PDF files and files formatted for the Adobe eBook Reader. The program allows a purchaser of an eBook Reader formatted electronic book to convert the format to one that is readable in any PDF viewer without the use restrictions imposed by the publisher. Katalov Decl. ¶ 6. Thus, the restrictions imposed by the publisher are stripped away, leaving the ebook in a "naked PDF" format that is readily copyable, printable, and easily distributed electronically. The conversion accomplished by the AEBPR program enables a purchaser of an ebook to engage in "fair use" of an ebook without infringing the copyright laws, for example, by allowing the lawful owner of an ebook to read it on another computer, to make a back-up

---

**1.** The purchases are frequently accompanied by an End User License Agreement which may contain contractual language limiting the user's rights to use the ebook, including the rights to sell or transfer the ebook or to copy or distribute the content of the ebook without the publisher's permission. *See* Declaration of O'Connell, Exh. A (EBIA Agreement, ¶ 4),

Exh. B. (Sybex Agreement, ¶ 2), Exh. C (Forth Inc. Agreement, Part III).

**2.** Adobe distributes the eBook Reader program free of charge and users download the software directly from the Internet onto their computers.

copy, or to print the ebook in paper form. The same technology, however, also allows a user to engage in copyright infringement by making and distributing unlawful copies of the ebook. Defendant was indicted for alleged violations of Section 1201(b)(1)(A) and (C) of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §§ 1201(b)(1)(A) and (C), for allegedly trafficking in and marketing of the AEBPR.

## 2. *The DMCA*

Congress enacted the DMCA following the adoption of the World Intellectual Property Organization Copyright Treaty as an expansion of traditional copyright law in recognition of the fact that in the digital age, authors must employ protective technologies in order to prevent their works from being unlawfully copied or exploited. As described by one court:

> In December 1996, the World Intellectual Property Organization ("WIPO"), held a diplomatic conference in Geneva that led to the adoption of two treaties. Article 11 of the relevant treaty, the WIPO Copyright Treaty, provides in relevant part that contracting states "shall provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law."
>
> The adoption of the WIPO Copyright Treaty spurred continued Congressional attention to the adaptation of the law of copyright to the digital age. Lengthy hearings involving a broad range of interested parties both preceded and succeeded the Copyright Treaty.... [A] critical focus of Congressional consideration of the legislation was the conflict between those who opposed anti-circumvention measures as inappropriate extensions of copyright impediments to fair use and those who supported them as essential to proper protection of copyrighted materials in the digital age. The DMCA was enacted in October 1998 as the culmination of this process.

*Universal City Studios, Inc. v. Reimerdes,* 111 F.Supp.2d 294, 315–16 (S.D.N.Y.2000) (citations omitted), *aff'd* 273 F.3d 429 (2d Cir.2001).

■■ Through the DMCA, Congress sought to prohibit certain efforts to unlawfully circumvent protective technologies, while at the same time preserving users' rights of fair use. Some understanding of the interplay between copyright and fair use is essential to understanding the issues confronting Congress and the issues presented here. Fair use and copyright are discussed in more detail below, but in brief, copyright grants authors the exclusive right to make and distribute copies of their original works of authorship but the doctrine of fair use permits a certain amount of copying for limited purposes without infringing the copyright, notwithstanding the exclusive rights of the copyright owner.

As part of the balance Congress sought to strike in protecting the rights of copyright owners while preserving fair use, Congress enacted three new anti-circumvention prohibitions, Section 1201(a)(1), Section 1201(a)(2) and Section 1201(b). The first two provisions target circumvention of technological measures that effectively control *access* to a copyrighted work; the third targets circumvention of technological measures that impose limitations on the *use* of protected works.

With regard to the first category, Congress banned both the act of circumventing access control restrictions as well as trafficking in and marketing of devices

that are primarily designed for such circumvention. Specifically, Section 1201(a)(1)(A) provides that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title." Thereafter, Section 1201(a)(2) provides that:

[n]o person shall manufacture, import, offer to the public, provide or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title [17 U.S.C. § 1 et seq.]; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

17 U.S.C. § 1201(a)(2).

 The third prohibition, however, addresses a different circumvention, specifically, circumventing a technological measure that imposes limitations on the use of a copyrighted work, or in the words of the statute, that "effectively protects the right of a copyright owner." Using language quite similar to Section 1201(a)(2), the Act provides that:

[n]o person shall manufacture, import, offer to the public, provide or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title [17 U.S.C.A. § 1 et seq.] in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

17 U.S.C. § 1201(b). Unlike Section 1201(a), however, Congress did *not* ban the act of circumventing the use restrictions. Instead, Congress banned only the trafficking in and marketing of devices primarily designed to circumvent the use restriction protective technologies. Congress did not prohibit the act of circumvention because it sought to preserve the fair use rights of persons who had lawfully acquired a work. *See* H.R. Rep. 105–551, pt. 1, at 18 (1998); Burton Decl. Ex. N.; Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, 65 Fed.Reg. 64,557 (2000) (codified at 37 C.F.R. § 201) ("The prohibition in section 1201(b) extends only to devices that circumvent copy control measures. The decision not to prohibit the conduct of circumventing copy controls was made, in part, because it would penalize some noninfringing conduct such as fair use."). In fact, Congress expressly disclaimed any intent to impair any person's rights of fair use: "Nothing in this section shall affect rights, remedies, or defenses to copyright infringement, in-

cluding fair use, under this title [17 U.S.C.A. § 1 et seq.]." 17 U.S.C. § 1201(c)(1).[3] Thus, circumventing use restrictions is not unlawful, but in order to protect the rights of copyright owners while maintaining fair use, Congress banned trafficking in devices that are primarily designed for the purpose of circumventing any technological measure that "effectively protects a right of a copyright owner," or that have limited commercially significant purposes other than circumventing use restrictions, or that are marketed for use in circumventing the use restrictions.

The difficulty is created by Section 1201(b)'s use of the phrase "effectively protects a right of a copyright owner" to define the prohibited device because the rights of a copyright owner are intertwined with the rights of others. The rights of a copyright owner include the exclusive rights to reproduce the copyrighted work, to prepare derivative works based upon the copyrighted work, to distribute copies by sale or otherwise, to perform the copyrighted work publicly, and to display the copyrighted work publicly. *See* 17 U.S.C. § 106. Exceptions to the copyright owner's exclusive rights are set forth in 17 U.S.C. §§ 107–120. One of those exceptions is that the copyright owner loses control over the disposition of a copy of a work upon the sale or transfer of the copy. 17 U.S.C. § 109. Thus, once a published copy is sold, the copyright owner has no right to restrict the further sale or transfer of that copy. *Id.* In addition, one of the most significant exceptions to the rights of a copyright owner is the doctrine of fair use. 17 U.S.C. § 107.

▇▇ Fair use is a defense to copyright infringement, allowing a certain amount of direct copying for certain uses, without the permission of the copyright owner and notwithstanding the copyright owner's exclusive rights. Section 107 provides that the fair use of a copyrighted work for purposes such as criticism, comment, news reporting, teaching, scholarship or research is not an infringement of a copyright. 17 U.S.C. § 107. Section 107 also sets forth a series of factors for determining whether any particular use is a "fair use," including: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.* There is no bright line test for determining whether any particular use is a "fair use" or is instead an act of copyright infringement, and each use requires a case-by-case determination. *See Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

The interplay between fair use and copyright weaves throughout defendant's motions to dismiss. The parties dispute whether Congress banned, or intended to ban, all circumvention tools or instead banned only those circumvention devices that would facilitate copyright infringement, and if, as a result, the DMCA is unconstitutionally vague. The parties also dispute whether, because of its effect on the fair use doctrine, the DMCA is an unconstitutional infringement upon the First Amendment and whether Congress had the power to enact the legislation. It is to these issues the court will next turn.

---

3. Congress also enacted specific provisions to protect certain uses, including exceptions for law enforcement, reverse engineering, encryption research and security testing. 17 U.S.C. § 1201(e)-(g) and 1201(f).

## DISCUSSION

Defendant's two motions to dismiss the indictment challenge the constitutionality of the DMCA on a number of grounds. Defendant contends that Section 1201(b) is unconstitutionally vague as applied to Elcomsoft and therefore violates the Due Process Clause of the Fifth Amendment. Defendant also contends that Section 1201(b) violates the First Amendment on several grounds: because it constitutes a content-based restriction on speech that is not sufficiently tailored to serve a compelling government interest, because it impermissibly infringes upon the First Amendment rights of third parties to engage in fair use, and because it is too vague in describing what speech it prohibits, thereby impermissibly chilling free expression. Finally, defendant contends that Congress exceeded its constitutional power in enacting the DMCA, and that the Act is therefore unconstitutional. Each argument will be addressed.

### 1. *Fifth Amendment Due Process Challenge*

Defendant first contends that Section 1201(b) is unconstitutionally vague as applied to Elcomsoft because it does not clearly delineate the conduct which it prohibits. Due Process Motion at 13. A statute violates the Due Process Clause of the Fifth Amendment if its prohibitions are not clearly defined. *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Vagueness may invalidate a statute for either of two reasons: first, the statute may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits, and second, the statute may authorize or encourage arbitrary and discriminatory enforcement. *City of Chicago v. Morales,* 527 U.S. 41, 56, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (citing *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). " 'It is established

that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits . . . .' " 527 U.S. at 56, 119 S.Ct. 1849 (plurality) (quoting *Giaccio v. Pennsylvania,* 382 U.S. 399, 402–03, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966)). A criminal statute is not vague if it provides adequate notice of the prohibited conduct in terms that a reasonable person of ordinary intelligence would understand. *United States v. Martinez,* 49 F.3d 1398, 1403 (9th Cir.1995), *cert. denied,* 516 U.S. 1065, 116 S.Ct. 749, 133 L.Ed.2d 696 (1996) (superseded by statute on other grounds).

Defendant argues that the DMCA bans only those tools that are primarily designed to circumvent usage control technologies in order to enable copyright infringement. Defendant reaches this conclusion because Congress did not ban the act of circumventing use control technologies and expressly refused to do so in order to avoid treading on legitimate fair use. Defendant thus argues that:

> [t]he legislative history and the language of the DMCA establish that Congress did not prohibit the act of circumventing usage control technologies. For reasons directly related to that decision, it also did not ban *all* tools which might be used to circumvent usage control technologies. Congress sought to prohibit only those tools which are intended to be used to circumvent usage control technologies for the purpose of copyright infringement. Section 1201(b) does not provide a constitutionally adequate notice of this prohibition.

Due Process Motion at 14. From the premise that Congress has banned only those tools that are intended to circumvent usage control technologies for the purpose of copyright infringement, defendant then

argues that the statute is unconstitutionally vague. "Section 1201(b) is doomed to inherent vagueness because not all tools are banned, and the language of the statute renders it impossible to determine which tools it in fact bans." *Id.* at 15. Defendant argues that because of the nature of the interplay between copyright owners' rights and fair use, any circumvention of a usage control technology for a legitimate purpose—such as for a fair use—must invariably involve circumvention of a technology that "protects the right of a copyright owner." Accordingly, there is no way for a manufacturer to know whether its tool is lawful. Moreover, this statutory vagueness leads to arbitrary enforcement.

The government's opposition brief does not directly address defendant's argument that some circumvention tools are prohibited while other circumvention tools are allowed. At the hearing, however, the government contended that the DMCA imposes a blanket ban on all circumvention tools. According to the government, Section 1201(b) does not prohibit only those tools that circumvent usage controls for the purpose of facilitating copyright infringement; the statute also prohibits tools that circumvent usage controls for the purpose of enabling fair use. Thus, if all tools that are primarily designed or produced for the purpose of circumventing protections afforded by technological measures are banned, the statute is not impermissibly vague.

Thus, the court's initial task is to determine whether the DMCA bans trafficking in all circumvention tools, regardless of whether they are designed to enable fair use or to facilitate infringement, or whether instead the statute bans only those tools that circumvent use restrictions for the purpose of facilitating copyright infringement. If all circumvention tools are banned, defendant's void-for-vagueness challenge necessarily fails.

The court must first consider the statutory language enacted by Congress. Despite defendant's repeated citations to the legislative history, if the language of the statute is clear, there is no need to resort to the legislative history in order to determine the statute's meaning. *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.,* 180 F.3d 1072, 1076 (9th Cir.1999). Section 1201(b) provides that:

> [n]o person shall manufacture, import, offer to the public, provide or otherwise traffic in any technology, product, service, device, component, or part thereof, that -
>
> (A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner under this title. [17 U.S.C.A. § 1 et seq.] in a work or a portion thereof . . . .

17 U.S.C. § 1201(b). The section is comprised of three parts: 1) trafficking in "any technology," "product," "service," "device," "component" or "part thereof"; 2) that is "primarily designed or produced for the purpose of circumventing protection afforded by a technological measure"; and 3) a technological measure that "effectively protects a right of a copyright owner" under the copyright statute.

The first element targets "any technology, product, service, device, component, or part thereof." This language is not difficult to decipher and is all-encompassing: it includes any tool, no matter its form, that is primarily designed or produced to circumvent technological protection.

Next, the phrase "circumvent protection afforded by a technological measure" is expressly defined in the statute to mean: "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." 17 U.S.C. § 1201(b)(2)(A).

Finally, the statute provides that "a technological measure 'effectively protects a right of a copyright owner under this title' if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title." *Id.* § 1201(b)(2)(B). The rights of a copyright owner are specified in 17 U.S.C. § 106. These include the exclusive rights:

(1) to reproduce the copyrighted work in copies or phonorecords;

(2) to prepare derivative works based upon the copyrighted work;

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. Putting Section 1201(b)(2)(B) together with Section 106, a technological measure "effectively protects the right of a copyright owner" if, in the ordinary course of its operation, it prevents, restricts or otherwise limits the exercise of any of the rights set forth in Section 106, such as the rights to reproduce the work, prepare derivative works, distribute copies of the work, perform the work publicly or by digital audio transmission, or display the work publicly.

■ Taken in combination, Section 1201(b) thus prohibits trafficking in any tool that avoids, bypasses, removes, deactivates, or otherwise impairs any technological measure that prevents, restricts or otherwise limits the exercise of the right to reproduce the work, prepare derivative works, distribute copies of the work, perform the work publicly or by digital audio transmission, or display the work publicly. In short, the statute bans trafficking in any device that bypasses or circumvents a restriction on copying or performing a work. Nothing within the express language would permit trafficking in devices designed to bypass use restrictions in order to enable a fair use, as opposed to an infringing use. The statute does not distinguish between devices based on the uses to which the device will be put. Instead, all tools that enable circumvention of use restrictions are banned, not merely those use restrictions that prohibit infringement. Thus, as the government contended at oral argument, Section 1201(b) imposes a blanket ban on trafficking in or the marketing of any device that circumvents use restrictions.

■ Because the statutory language is clear, it is unnecessary to consider the legislative history to determine congressional intent or the scope of the statute. Nevertheless, statements within the legislative history support the interpretation reached above. Congress was concerned with promoting electronic commerce while protecting the rights of copyright owners, particularly in the digital age where near exact copies of protected works can be made at virtually no cost and distributed instantaneously on a worldwide basis. S.Rep. No. 105–190, at 8 (1998), Burton Decl. Exh. P. Congress recognized that "most acts of circumventing a technological copyright protection measure will occur in the course of con-

duct which itself implicates the copyright owners rights," *i.e.,* acts of infringement. *Id.* at 29. Accordingly,

> [p]aragraph (b)(1) prohibits manufacturing, importing, offering to the public, providing, or otherwise trafficking in certain technologies, products, services, device, components, or parts thereof *that can be used to circumvent a technological protection measure* that effectively protects a right of a copyright owner under title 17 in a work or portion thereof.... Like paragraph (a)(2), this provision is designed to protect copyright owners ....

*Id.* at 29–30 (emphasis added). Congress thus recognized that most uses of tools to circumvent copy restrictions would be for unlawful infringement purposes rather than for fair use purposes and sought to ban all circumvention tools that "can be used" to bypass or avoid copy restrictions.

Defendant relies heavily on congressional intent to preserve fair use but that congressional intent does not change the analysis. The Act expressly disclaims any intent to affect the rights, remedies, limitations, or defenses to copyright infringement, including the right of fair use. 17 U.S.C. § 1201(c). Congress' expressed intent to preserve the right of fair use is not inconsistent with a ban on trafficking in circumvention technologies, even those that could be used for fair use purposes rather than infringement. · Fair use of a copyrighted work continues to be permitted, as does circumventing use restrictions for the purpose of engaging in a fair use, even though engaging in certain fair uses of digital works may be made more difficult if tools to circumvent use restrictions cannot be readily obtained.

■ The inescapable conclusion from the statutory language adopted by Congress and the legislative history discussed above is that Congress sought to ban all circumvention tools because most of the time those tools would be used to infringe a copyright. Thus, while it is not unlawful to circumvent for the purpose of engaging in fair use, it is unlawful to traffic in tools that allow fair use circumvention. That is part of the sacrifice Congress was willing to make in order to protect against unlawful piracy and promote the development of electronic commerce and the availability of copyrighted material on the Internet.

Accordingly, there is no ambiguity in what tools are allowed and what tools are prohibited because the statute bans trafficking in or the marketing of *all* circumvention devices. Moreover, because all circumvention tools are banned, it was not necessary for Congress to expressly tie the use of the tool to an unlawful purpose in order to distinguish lawful tools from unlawful ones. Thus, the multi-use device authorities cited by defendant, such as the statutes and case law addressing burglary tools and drug paraphernalia, offer defendant no refuge. The law, as written, allows a person to conform his or her conduct to a comprehensible standard and is thus not unconstitutionally vague. *Coates v. City of Cincinnati,* · 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971). Therefore, defendant's motion to dismiss the indictment on due process grounds is denied.

### 2. *First Amendment Challenges*

Defendant asserts several First Amendment challenges, arguing that the DMCA violates the First Amendment as applied to the sale of the AEBPR, that the DMCA violates the First Amendment because it infringes the First Amendment rights of third parties, and that the DMCA violates the First Amendment because it is impermissibly vague, thus chilling otherwise protected speech. As an initial matter, however, the government contends that review under the First Amendment is unnecessary. The government offers two argu-

ments: 1) the statute bans the sale of technology and the sale of technology is not "speech"; and 2) the AEBPR, in object code form, is not speech protected by the First Amendment. Neither argument is persuasive.

■ First, the government erroneously contends that the DMCA does not implicate the First Amendment because defendant's sale of circumvention technology is not speech. While selling is the act giving rise to potential criminal liability under Section 1201(b), the DMCA bans trafficking in the AEBPR, software which at some level contains expression, thus implicating the First Amendment. As noted by defendant in reply, the government could not ban the sale of newspapers without implicating the First Amendment, even if newspapers themselves were not banned. First Amendment Reply at 4. First Amendment scrutiny is triggered because the statute bans the sale of something that at some level contains protected expression. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227–28, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (invalidating tax on magazines, with exceptions based on content, as inconsistent with First Amendment); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (invalidating as inconsistent with the First Amendment New York's "Son of Sam" law, which required a criminal's income from works describing his crime be deposited into an escrow account for the benefit of victims of crime).

■ Second, the government contends that computer code is not speech and hence is not subject to First Amendment protections. The court disagrees. Computer software is expression that is protected by the copyright laws and is therefore "speech" at some level, speech that is protected at some level by the First Amendment. *See Sony Computer Entm't*

*v. Connectix Corp.*, 203 F.3d 596, 602 (9th Cir.) (recognizing that object code may be copyrighted as expression under 17 U.S.C. § 102(b)), *cert. denied*, 531 U.S. 871, 121 S.Ct. 172, 148 L.Ed.2d 118 (2000). While there is some disagreement over whether object code, as opposed to source code, is deserving of First Amendment protection, the better reasoned approach is that it is protected. Object code is merely one additional translation of speech into a new, and different, language. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–49 (2d Cir.2001) (recognizing that code is speech); *Reimerdes*, 111 F.Supp.2d at 326–27; *Bernstein v. U.S. Dep't of State*, 922 F.Supp. 1426, 1436 (N.D.Cal.1996) (recognizing that source code is speech but not reaching the object code issue). As the *Reimerdes* court explained:

It cannot be seriously argued that any form of computer code may be regulated without reference to First Amendment doctrine. The path from idea to human language to source code to object code is a continuum. As one moves from one side to the other, the levels of precision and, arguably, abstraction increase, as does the level of training necessary to discern the idea from the expression. Not everyone can understand each of these forms. Only English speakers will understand English formulations. Principally those familiar with the particular programming language will understand the source code expression. And only a relatively small number of skilled programmers and computer scientists will understand the machine readable object code. But each form expresses the same idea, albeit in different ways.

All modes by which ideas may be expressed or, perhaps, emotions evoked— including speech, books, movies, art, and music—are within the area of First Amendment concern. As computer code—whether source or object—is a

means of expressing ideas, the First Amendment must be considered before dissemination may be prohibited or regulated. In that sense, computer code is covered, or as sometimes said, "protected" by the First Amendment. But that conclusion still leaves for determination the level of scrutiny to be applied in determining the constitutionality of regulation of computer code.

111 F.Supp.2d at 326–27 (footnotes omitted).

Accordingly, it is appropriate to consider defendant's First Amendment challenges.

### A. Whether the DMCA Violates the First Amendment as Applied to the Sale of AEBPR

Defendant first argues that the DMCA, as applied to the sale of defendant's AEBPR, violates the First Amendment. Defendant's argument is structured as follows: computer code is speech protected by the First Amendment; the DMCA regulates that speech based upon its content because it bans the code that conveys a certain message (i.e., circumventing use restrictions); content-based regulations must be narrowly tailored; the DMCA is not narrowly tailored; ergo, the DMCA is unconstitutional. See First Amendment Reply at 1.

In opposition, the government argues that under the appropriate level of scrutiny, the DMCA does not violate the First Amendment as applied to the sale of the AEBPR. The government argues that strict scrutiny is not appropriate because the statute does not target speech and is content-neutral with respect to speech. Under intermediate scrutiny, the government has legitimate interests in promoting electronic commerce and in protecting the rights of copyright owners, and the statute is sufficiently tailored to achieve those objectives without unduly burdening free speech.

In order to determine whether the DMCA violates the First Amendment as applied to the sale of the AEBPR, the court must first determine the appropriate level of scrutiny to apply to the statute. As a general matter, content-based restrictions on speech are permissible only if they serve a compelling state interest and do so by the least restrictive means. Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 680, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citing Boos v. Barry, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988)); Corley, 273 F.3d at 449 (quoting Sable Communications of Cal. v. FCC, 492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989)). On the other hand, if a statute or regulation is content-neutral, it

> will be sustained if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. "Rather, the requirement of narrow tailoring is satisfied 'so long as the … regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Narrow tailoring in this context requires, in other words, that the means chosen do not "burden substantially more speech than is necessary to further the government's legitimate interests."

Turner Broadcasting, 512 U.S. at 662, 114 S.Ct. 2445 (citations omitted).

When speech and non-speech elements are combined in a single course of conduct, a sufficiently important government interest in regulating the non-speech

element can justify incidental intrusions on First Amendment freedoms. *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir.2000) (applying intermediate scrutiny to regulations banning exportation of encryption software).

The principal inquiry in determining whether a statute is content-neutral is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). The government's purpose is the controlling consideration. *Id.* Here, the parties have pointed to no portion of the legislative history that demonstrates a congressional intent to target speech because of its expressive content. Rather, Congress sought ways to further electronic commerce and protect intellectual property rights, while at the same time protecting fair use. In order to balance these priorities, Congress sought to ban trafficking in any technology or device that could be used to circumvent technological restrictions that served to protect the rights of copyright owners.

Defendant contends that because this occurs in a digital arena, the technological measures necessarily involve computer code and, thus, necessarily implicate speech protected by the First Amendment. Defendant further argues that the regulation is not content-neutral because it only bans a certain type of speech—speech that allows the circumvention of protection measures—and therefore that strict scrutiny must be applied. "Indeed, it is precisely the content of the code that causes the government to regulate it." First Amendment Reply at 5.

Defendant's argument, however, stretches too far. In the digital age, more and more conduct occurs through the use

of computers and over the Internet. Accordingly, more and more conduct occurs through "speech" by way of messages typed onto a keyboard or implemented through the use of computer code when the object code commands computers to perform certain functions. The mere fact that this conduct occurs at some level through expression does not elevate all such conduct to the highest levels of First Amendment protection. Doing so would turn centuries of our law and legal tradition on its head, eviscerating the carefully crafted balance between protecting free speech and permissible governmental regulation.

On its face, the statute does not target speech. Section 1201(b) bans trafficking in devices, whether software, hardware, or other. Thus, strict scrutiny is not appropriate in the absence of any suggestion that Congress sought to ban particular speech, qua speech. Courts that have considered the issue in the context of the DMCA have determined that Congress was not concerned with suppressing ideas but instead enacted the anti-trafficking measures because of the function performed by the code. *Reimerdes*, 111 F.Supp.2d at 329 ("The reason that Congress enacted the anti-trafficking provision of the DMCA had nothing to do with suppressing particular ideas of computer programmers and everything to do with functionality."); *Corley*, 273 F.3d at 454. Thus, to the extent that the DMCA targets computer code, Congress sought to ban the code not because of what the code says, but rather because of what the code does.

Defendant contends that these authorities are wrongly decided and that it is impossible to regulate the "functional" aspects of computer code without necessarily regulating the content of the expressive aspects of the code. Divorcing the func-

tion from the message, however, is precisely what the courts have done in other contexts, for example, in determining what portions of code are protectable by copyright and what uses of that same code are permitted as fair uses. *See Connectix*, 203 F.3d at 602–03 (recognizing that computer programs pose unique problems in copyright context because they are both expressive and functional utilitarian articles; copyright protects only the expression, and fair use allows incidental copying for the purpose of reverse engineering code to determine its unprotected functional aspects).

█ Accordingly, the court concludes that intermediate scrutiny, rather than strict scrutiny, is the appropriate standard to apply. Under this test, the regulation will be upheld if it furthers an important or substantial government interest unrelated to the suppression of free expression, and if the incidental restrictions on First Amendment freedoms are no greater than essential to the furtherance of that interest. *Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445. By this standard, a statute is constitutional as long as it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation" and the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests. *Id.*

### 1) *The Governmental Interests*

█ In this case, there are two asserted governmental interests: preventing the unauthorized copying of copyrighted works and promoting electronic commerce. As noted in the House Report:

> The debate on this legislation highlighted two important priorities: promoting the continued growth and development of electronic commerce; and protecting intellectual property rights. These goals are mutually supportive. A thriving electronic marketplace provides new and powerful ways for the creators of intellectual property to make their works available to legitimate consumers in the digital environment. And a plentiful supply of intellectual property— whether in the form of software, music, movies, literature, or other works— drives the demand for a more flexible and efficient electronic marketplace.

H.R.Rep. No. 105–551, pt. 2, at 23 (1998), Burton Decl. Exh. O.

Congress recognized that a primary threat to electronic commerce and to the rights of copyright holders was the plague of digital piracy. The Senate Report notes:

> Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy. Legislation implementing the treaties provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works. It will facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius. It will also encourage the continued growth of the existing off-line global marketplace for copyrighted works in digital format by setting strong international copyright standards.

S.Rep. No. 105–190, at 8 (1998), Burton Decl. Exh. P. Congress has elsewhere expressed its concern over the state of intellectual property piracy:

> Notwithstanding [penalties for copyright infringement] copyright piracy of intellectual property flourishes, assisted in large part by today's world of advanced

technologies. For example, industry groups estimate that counterfeiting and piracy of computer software cost the affected copyright holders more than $11 billion last year (others believe the figure is closer to $20 billion). In some countries, software piracy rates are as high as 97% of all sales. The U.S. rate is far lower (25%) but the dollar losses ($2.9 billion) are the highest worldwide. The effect of this volume of theft is substantial: lost U.S. jobs, lost wages, lower tax revenue, and higher prices for honest purchasers of copyrighted software. Unfortunately, the potential for this problem to worsen is great.

*Reimerdes,* 111 F.Supp.2d at 335 n. 230 (citing H.R.Rep. No. 106–216 (1999)).

These governmental interests are both legitimate and substantial.

### 2) *Whether Section 1201(b) is Sufficiently Tailored*

■ The next step is to determine whether these governmental interests would be promoted less effectively absent the regulation and whether the means chosen burden substantially more speech than is necessary to further the government's interests. *Turner Broadcasting,* 512 U.S. at 662, 114 S.Ct. 2445.

Without the ban on trafficking in circumvention tools, the government's interest in promoting electronic commerce, preserving the rights of copyright holders, and preventing piracy would be undermined. The absence of effective technological restrictions to prevent copyright infringement would inevitably result in even more rampant piracy, with a corresponding likely decrease in the willingness of authors and owners of copyrighted works to produce them in digital form or make the works available on-line. Thus, there is little question that the governmental interests would be promoted less effectively in the absence of the regulation. Neverthe-

less, there is substantial disagreement between the parties with regard to whether or not the regulation "substantially burdens more speech than is necessary" to achieve the government's interests.

Defendant contends that the DMCA burdens substantially more speech than is necessary to protect copyright holders from digital copyright pirates. First, defendant contends that it was not necessary to ban all circumvention tools, because those tools can serve legitimate purposes. Congress had other options more narrowly tailored to prevent the harm sought: it could have made the penalties for infringement more severe or it could have criminalized the use of the Internet to distribute infringing copies. Second, defendant argues that the DMCA fails to pass constitutional review because

> the government's approach to the DMCA effectively eliminates fair use, limits noninfringing uses and prevents access to material in the public domain and uncopyrightable material protected by "technological measures." Many of these uses are themselves protected expression and none of them constitute copyright infringement. The anti-trafficking provisions of the DMCA do not "respon[d] precisely to the substantive problem which legitimately concern[ed]" [Congress] and that it therefore do [sic, does] not comport with the First Amendment.

First Amendment Motion at 12 (citing *Members of the City Council of L.A. v. Taxpayers for Vincent,* 466 U.S. 789, 810, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)).

The government responds that there are numerous exceptions to the DMCA that demonstrate that the DMCA is sufficiently tailored to withstand intermediate scrutiny:

> Congress carefully balanced, *inter alia,* the needs of law enforcement and other

government agencies, computer programmers, encryption researchers, and computer security specialists against the serious problems created by circumvention technology. *See* 17 U.S.C. §§ 1201(e)–1201(g), 1201(j). That defendant Elcomsoft's conduct did not fall within the exceptions does not suggest, let alone prove, the DMCA sweeps to broadly.

Opposition Brief at 24 (citing *Fed. Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) ("statutory prohibitions and exceptions" regarding political contributions by corporations and unions held "sufficiently tailored ... to avoid undue restriction on the associational interests asserted" by political organization)).

Defendant's arguments are not persuasive. First, the DMCA does not "eliminate" fair use. Although certain fair uses may become more difficult, no fair use has been prohibited. Lawful possessors of copyrighted works may continue to engage in each and every fair use authorized by law. It may, however, have become more difficult for such uses to occur with regard to technologically protected digital works, but the fair uses themselves have not been eliminated or prohibited.

For example, nothing in the DMCA prevents anyone from quoting from a work or comparing texts for the purpose of study or criticism. It may be that from a technological perspective, the fair user my find it more difficult to do so—quoting may have to occur the old fashioned way, by hand or by re-typing, rather than by "cutting and pasting" from existing digital media. Nevertheless, the fair use is still available. Defendant has cited no authority which guarantees a fair user the right to the most technologically convenient way to engage in fair use. The existing authorities have rejected that argument. *See Corley*, 273 F.3d at 459 ("We know of no authority for the proposition that fair use, as protected by the Copyright Act, much less the Constitution, guarantees copying by the optimum method or in the identical format of the original.... Fair use has never been held to be a guarantee of access to copyrighted material in order to copy it by the fair user's preferred technique or in the format of the original.")

In the same vein, the DMCA does not "prevent access to matters in the public domain" or allow any publisher to remove from the public domain and acquire rights in any public domain work. Nothing within the DMCA grants any rights to anyone in any public domain work. A public domain work remains in the public domain and no party has any intellectual property right in the expression of that work. A flaw in defendant's argument is that it presumes that the only available version of a public domain work is an electronic, technology-protected, version. If a work is in the public domain, any person may make use of that expression, for whatever purposes desired. To the extent that a publisher has taken a public domain work and made it available in electronic form, and in the course of doing so has also imposed use restrictions on the electronic version, the publisher has not gained any lawfully protected intellectual property interest in the work. The publisher has only gained a technological protection against copying that particular electronic version of the work.

The situation is little different than if a publisher printed a new edition of Shakespeare's plays, but chose to publish the book on paper that was difficult to photocopy. Copy protection measures could be employed, similar to what is now commonly done on bank checks, so that the photocopy revealed printing that is otherwise unnoticeable on the original, perhaps rendering the text difficult to read on the photocopy Would the publisher have thus

recaptured Shakespeare's plays from the public domain? No, the publisher has gained no enforceable rights in the works of Shakespeare; all that has happened is that the purchaser of the copy-protected book would be unable to easily make a photocopy of that particular book.

Publishing a public domain work in a restricted format does not thereby remove the work from the public domain, even if it does allow the publisher to control that particular electronic copy. If this is an evil in the law, the remedy is for Congress to prohibit use or access restrictions from being imposed upon public domain works. Or perhaps, if left to the market, the consuming public could decline to purchase public domain works packaged with use restrictions.

In addition, the alternatives proposed by defendant—enacting more severe penalties for copyright infringement—may not be as effective at preventing widespread copyright infringement and electronic piracy as is banning the trafficking in or the marketing of the tools that allow piracy to thrive. Congress certainly could have approached the problem by targeting the infringers, rather than those who traffic in the tools that enable the infringement to occur. However, it is already unlawful to infringe, yet piracy of intellectual property has reached epidemic proportions. Pirates are world-wide, and locating and prosecuting each could be both impossible and ineffective, as new pirates arrive on the scene. But, pirates and other infringers require tools in order to bypass the technological measures that protect against unlawful copying. Thus, targeting the tool sellers is a reasoned, and reasonably tailored, approach to "remedying the evil" targeted by Congress. In addition, because tools that circumvent copyright protection measures for the purpose of allowing fair use can also be used to enable infringement, it is reasonably necessary to ban the sale of all circumvention tools in order to achieve the objectives of preventing widespread copyright infringement and electronic piracy in digital media. Banning the sale of all circumvention tools thus does not substantially burden more speech than is necessary.

■■■ Under intermediate scrutiny, it is not necessary that the government select the least restrictive means of achieving its legitimate governmental interest. By its very nature, the intermediate scrutiny test allows some impingement on protected speech in order to achieve the legitimate governmental objective. A sufficiently important government interest in regulating the targeted conduct can justify incidental limitations on First Amendment freedoms. *O'Brien,* 391 U.S. 367, 88 S.Ct. 1673. Having considered the arguments asserted by the parties, the court finds that the DMCA does not burden substantially more speech than is necessary to achieve the government's asserted goals of promoting electronic commerce, protecting copyrights, and preventing electronic piracy.

B. *Overbreadth Challenge: Does the DMCA Substantially Burden the First Amendment Rights of Others?*

■■■■ Defendant next asserts a facial challenge to the DMCA, contending that the statute is overbroad because it infringes upon the First Amendment rights of third parties. In a facial challenge on overbreadth grounds, the challenger contends that the statute at issue is invalid because it is so broadly written that it infringes unacceptably on the First Amendment rights of third parties. *Anderson v. Nidorf,* 26 F.3d 100, 103 (9th Cir.1994), *cert. denied,* 514 U.S. 1035, 115 S.Ct. 1399, 131 L.Ed.2d 287 (1995); *Taxpayers for Vincent,* 466 U.S. at 798–99, 104 S.Ct. 2118. "A statute will be declared unconstitutional only if the court finds 'a realistic danger that the statute itself will significantly compromise recognized First

Amendment protections of parties not before the Court.'" The overbreadth must be·not only 'real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'" *Nidorf*, 26 F.3d at 104 (citing *New York State Club Ass'n v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) and *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Defendant contends that the DMCA is unconstitutionally overbroad on two grounds: first, the statute impairs the First Amendment right to access non-copyrighted works; and second, the statute precludes third parties from exercising their rights of fair use.

■ The fatal flaw in defendant's argument, however, is that facial attacks on overbreadth grounds are limited to situations in which the statute or regulation by its terms regulates spoken words or expressive conduct. In *Roulette v. City of Seattle*, 97 F.3d 300 (9th Cir.1996), the Ninth Circuit noted that "the Supreme Court has entertained facial freedom-of-expression challenges only against statutes that, 'by their terms,' sought to regulate 'spoken words,' or patently 'expressive or communicative conduct' such as picketing or handbilling." *Id.* at 303. Reviewing Supreme Court precedent, the Ninth Circuit concluded that "[t]he lesson we take from *Broadrick* and its progeny is that a facial freedom of speech attack must fail unless, at a minimum, the challenged statute 'is directed narrowly and specifically at expression or conduct commonly associated with expression.'" *Id.* at 305 (citations omitted). Because the statute at issue in *Roulette* was addressed to conduct that

was not commonly associated with expression—sitting or lying on sidewalks—the Ninth Circuit rejected the facial attack on the ordinance.

■ Under *Roulette*, defendant's facial attack on the DMCA necessarily fails. By its terms, the statute is directed to trafficking·in·or the marketing of "any technology, product, service, device, component, or part thereof," that circumvents usage control restrictions. The statute is not directed "narrowly and specifically at expression or conduct commonly associated with expression." Software as well as hardware falls within the scope of the Act, as does any other technology or device. Accordingly, an overbreadth facial challenge is not available.

Even if the DMCA were to be considered a statute directed at conduct commonly associated with expression and the court were to consider the merits of the facial challenge, however, defendant's argument is ultimately unsuccessful. In order to prevail on a facial overbreadth challenge, defendant must establish that there is a realistic danger that the First Amendment rights of third parties will be significantly compromised. Defendant bases its argument on the assertion that the DMCA "significantly compromises" the First Amendment rights of third parties in two ways: 1) it impacts third parties' rights to access public domain and non-copyrighted works; and 2) it impacts the fair use rights of third parties, which it contends are protected by the First Amendment. Assuming for the sake of discussion that these asserted rights are protected by the First Amendment, an issue which is not clear,[4]

---

4. The is no direct authority for the proposition that the doctrine of fair use is coextensive with the First Amendment, such that "fair use" is a First Amendment right. As noted by the Second Circuit, "the Supreme Court has never held that fair use is constitutionally required, although some isolated statements

in its opinions might arguably be enlisted for such a requirement." *Corley*, 273 F.3d at 458. There is plainly a tension between the First Amendment's command that "Congress shall make no law ... abridging the freedom of speech" and the copyright laws which grant limited monopolies to authors to pub-

defendant's challenge nevertheless fails because the DMCA does not substantially impair those rights.

 Defendant first argues that the DMCA "runs afoul of the First Amendment because it places almost unlimited power in the hands of copyright holders to control information, including information that is not even protected by copyright. Society has a strong interest in the free flow of such information." First Amendment Motion at 13 (citing *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)). Thus, according to defendant, because society has a strong interest in the free flow of such information which is based in the First Amendment, the DMCA violates the First Amendment by allowing others to impair that interest.

The argument is not compelling. *Bellotti* recognized that the First Amendment extends beyond protection of the press and the self-expression of individuals and includes prohibiting the government from limiting the stock of information from which members of the public may draw. 435 U.S. at 783, 98 S.Ct. 1407. Assuming for the sake of argument that it would violate the First Amendment for the gov-

ernment to grant exclusive copyright-like rights in works that have already entered the public domain, that situation is not presented here. The hole in defendant's argument is that the DMCA does not grant anyone exclusive rights in public domain works or otherwise non-copyrighted expression. A public domain work remains in the public domain. Any person may use the public domain work for any purpose—quoting, republishing, critiquing, comparing, or even making and selling copies. Publishing the public domain work in an electronic format with technologically imposed restrictions on how that particular copy of the work may be used does not give the publisher any legally enforceable right to the expressive work, even if it allows the publisher to control that particular copy.

Similarly, with regard to the argument that fair use rights are impaired, as discussed above, the DMCA does not eliminate fair use or substantially impair the fair use rights of anyone. Congress has not banned or eliminated fair use and nothing in the DMCA prevents anyone from quoting from a work or comparing texts for the purpose of study or criticism. The fair user may find it more difficult to

lish and profit from their original works of authorship. 1 M.B. Nimmer & D. Nimmer, *Nimmer on Copyright*, § 1.10[A] at 1–61.55 to 1–61.56. Several courts have recognized that the limitations on copyright, such as the idea-expression dichotomy and to some extent fair use, are what serve to protect First Amendment interests. *See Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (noting that some opportunity for fair use has been thought necessary to fulfill copyright's purpose of promoting the progress of science and the useful arts). The Supreme Court has also described the doctrine as an "equitable rule of reason." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 448, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). So too, the

Ninth Circuit has never held that fair use is a right guaranteed by the First Amendment. *L.A. News Serv. v. Tullo*, 973 F.2d 791 (9th Cir.1992), relied on by defendant, did not hold that "fair use" is a constitutional right under the First Amendment, although it did recognize that First Amendment concerns are addressed in the copyright field through the idea/expression dichotomy and the fair use doctrine. *Id.* at 795. *See also Connectix*, 203 F.3d at 602–03 (discussing fair use with no mention of First Amendment underpinnings); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir.) (fair use is an equitable rule of reason requiring the careful balancing of multiple factors in light of the purposes of copyright), *cert. dismissed*, 521 U.S. 1146, 118 S.Ct. 27, 138 L.Ed.2d 1057 (1997).

engage in certain fair uses with regard to electronic books, but nevertheless, fair use is still available.

Defendant makes much of the right to make a back-up copy of digital media for personal use, holding this right up as an example of how the DMCA eliminates fair use. Defendant relies heavily on *Recording Industry Association of America v. Diamond Multimedia Systems*, 180 F.3d 1072 (9th Cir.1999), for the assertion that the right to make a copy of electronic media for personal, noncommercial use, is a paradigmatic fair use consistent with the Copyright Act. First Amendment Motion at 16. But, defendant overstates the significance and holding of that decision. The Ninth Circuit was not presented with, and did not hold, that the right to make a copy for personal use is protected as a fair use right or protected as a right guaranteed by the Constitution. Rather, the Ninth Circuit was discussing the Audio Home Recording Act of 1992, 17 U.S.C. § 1001, and the statutory exemption for home taping which protects all noncommercial copying by consumers of digital and analog musical recordings. The court held that copying for personal, noncommercial use was consistent with the Audio Home Recording Act's main purpose of facilitating personal use. *Id.* at 1079.

■ Courts have been receptive to the making of an archival copy of electronic media in order to safeguard against mechanical or electronic failure. *See Vault Corp. v. Quaid Software Ltd.,* 847 F.2d 255, 267 (5th Cir.1988). Making a back-up copy of an ebook, for personal noncommercial use would likely be upheld as a non-infringing fair use. But the right to make a back-up copy of "computer programs" is

a statutory right, expressly enacted by Congress in Section 117(a), and there is as yet no generally recognized right to make a copy of a protected work, regardless of its format, for personal noncommercial use. There has certainly been no generally recognized First Amendment right to make back-up copies of electronic works. Thus, to the extent the DMCA impacts a lawful purchaser's "right" to make a back-up copy, or to space-shift that copy to another computer, the limited impairment of that one right does not significantly compromise or impair of the First Amendment rights of users so as to render the DMCA unconstitutionally overbroad.

### C. Whether the DMCA Is Unconstitutionally Vague Under the First Amendment

■ Defendant's final First Amendment challenge is that the DMCA is unconstitutionally vague under the First Amendment because it "provokes uncertainty among speakers" about precisely what speech is prohibited. *Reno v. ACLU*, 521 U.S. 844, 871, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Defendant argues that "[t]he DMCA criminalizes the manufacture and sale of a device that 'is *primarily designed* or produced for the purpose of circumventing a technological measure that effectively controls access[5] to a work protected under this title' if the device has 'only *limited commercially significant purpose* or use other than to circumvent a technological measure.'" First Amendment Motion at 17. Defendant's premise is that the DMCA regulates expression based at least in part upon the motive of the speaker, specifically, the purpose for which the program was pri-

---

5. Defendant's vagueness challenge thus appears to erroneously challenge Section 1201(a)(2)'s prohibition on trafficking in technology that is primarily designed to circumvent *access* restrictions, rather than Section

1201(b)'s ban on trafficking in devices that circumvent *use* restrictions. The language of the two statutes is similar, however, and the court will treat the argument as if asserted against Section 1201(b).

marily designed and the extent to which there was a commercially significant purpose in doing so other than the circumvention of copyrighted works. In order to determine if the code violates the DMCA, the seller must assess all possible uses of the technology and determine which are the *"significant purpose[s]"* and what it is "primarily" designed to do. First Amendment Reply at 13.

In opposition, the government argues that the statutory language "primarily designed or produced for" is substantially similar to language that has been upheld in other cases, citing the Supreme Court's decisions in *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("designed for" and "marketed primarily for use" drug law not unconstitutionally vague), and *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 114 S.Ct. 1747, 128 L.Ed.2d 539 (1994) ("primarily intended ... for use" drug law not unconstitutionally vague), as well as the Second Circuit's decision in *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 685–86 (2d Cir.1996) ("designed for" gun law not unconstitutionally vague). The government does not address defendant's argument that the "limited commercially significant purpose" phrase renders the statute impermissibly vague, nor does it address the vagueness argument in the context of the alleged impermissible chilling effect on First Amendment rights.

In reply, defendant argues that this statute is distinguishable from the drug paraphernalia statute at issue in *Flipside*, 455 U.S. 489, 102 S.Ct. 1186, because

> it should be obvious that it is considerably easier to determine if an item was "designed or marketed for use with illegal drugs" than if it was "primarily designed or produced for the purpose of circumventing a technological measure

that effectively controls access to a work protected under" Title 17 of the United States Code. The challenged provision in *Flipside* requires only a rudimentary knowledge of illegal drug use. The DMCA, by contrast, requires knowledge of (a) the primary and secondary uses of immensely sophisticated technology, (b) whether the technology "effectively" controls access *vis a vis* other controls, and (c) knowledge of the provisions of Title 17 of the United States Code, which regulates copyrights including its provision as they relate to fair use. The DMCA, to put it mildly, is significantly more difficult to understand, and thus more vague.

First Amendment Reply at 12–13.

Once again, defendant's arguments are not persuasive. The primary flaw in defendant's argument is that the court rejects the contention that the DMCA is a content-based restriction on speech and thus *Reno v. ACLU* is inapplicable. *Reno v. ACLU* involved a challenge to the Communications Decency Act's provisions that sought to protect minors from harmful material on the Internet. The CDA sought to protect children from the primary harmful effects of "indecent" and "patently offensive" speech and was thus a content-based blanket restriction on speech. 521 U.S. at 868, 117 S.Ct. 2329. Among the challenged provisions was the knowing transmission of "obscene or indecent" messages to any recipient under 18 years of age and the knowing sending or displaying to a person under 18 years of age any message "that, in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexual or excretory activities or organs." *Id.* at 859–60, 117 S.Ct. 2329. The Court held that the statutory language—"indecent" and "in context, depicts or describes, in terms patently offensive as measured by contemporary community standards, sexu-

al or excretory activities or organs"—was unconstitutionally vague in the absence of statutory definitions, and as a result would "provoke uncertainty among speakers about how the two standards relate to each other and just what they, mean" thereby causing a chilling effect on free speech. *Id.* at 871–72, 874, 117 S.Ct. 2329. Here, by contrast, the DMCA is not a content-based restriction on speech and its restrictions do not "provoke uncertainty among speakers" about what speech is permitted and what speech is prohibited. The statute is not unconstitutionally vague in violation of the First Amendment.

In addition, defendant's attempt to distinguish *Flipside* and the other authorities is not persuasive, and ultimately, *Flipside* and *Posters 'N' Things* are controlling. The "primarily designed for" and "marketed for use" language is not unconstitutionally vague. Similarly, the "has only limited commercially significant purpose other than to circumvent protection afforded by a technological measure that effectively protects the right of a copyright owner under this title" is also not unconstitutionally vague.[6] Section 106 sets forth the rights of a copyright owner; Section 107 sets forth the criteria for the fair use exception. Together with the definitions contained in Section 1201(b)(2), the DMCA's prohibition on trafficking in technologies that circumvent use and copy restrictions is sufficiently clear to withstand a vagueness attack.

### 3. *Congressional Authority to Enact the DMCA*

 Defendant's final challenge is that Congress exceeded its authority in enact-

ing the DMCA and that, as a result, the statute is unconstitutional. The federal government is one of enumerated powers and Congress may exercise only those powers granted to it. *McCulloch v. Maryland,* 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819); *United States v. Lopez,* 514 U.S. 549, 566, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The Constitution contains several express grants of power to Congress, among them the Intellectual Property Clause and the Commerce Clause.

 Under the Intellectual Property Clause, Congress is empowered "to promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, § 8 cl. 8. This power, while broad, is not unlimited. More than a century ago, the Supreme Court held that Congress could not exercise its Intellectual Property power to grant exclusive rights in matters other than "writings" or "discoveries" such that the Trademark Act of 1876 was not a proper exercise of Congress' Intellectual Property power.[7] *The Trade–Mark Cases,* 100 U.S. 82, 93–94, 10 Otto 82, 25 L.Ed. 550 (1879). Congress may not, for example, grant exclusive rights to writings that do not constitute original works of authorship. *Feist Publ'ns v. Rural Tel. Serv. Co.,* 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Similarly, the Intellectual Property Clause limits Congress' powers so that patents may only be granted in new inventions that are not obvious in view of the existing art and Congress may not authorize the issuance of a patent

---

**6.** Defendant appears to contend that the legal complexity of a statute may render it unconstitutionally vague, but cites no authority in support of that assertion. If legal complexity is sufficient to support a vagueness challenge, the Internal Revenue Code would almost certainly have been struck down long ago.

**7.** The Court also held that the Trademark Act could not have been enacted pursuant to Congress' Commerce Powers, but that aspect of the Court's holding was superseded by the development of the Court's Commerce Clause jurisprudence over the next 100 years.

whose effects are to remove existing knowledge from the public domain. *Graham v. John Deere Co. of Kan. City,* 383 U.S. 1, 6, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

■ Under the Commerce Clause, Congress' power is quite broad. Congress may regulate the use of the channels of interstate commerce; may regulate and protect the instrumentalities of interstate commerce, including persons or things in interstate commerce; and may regulate those activities having a substantial relation to, or which substantially affect, interstate commerce. *Lopez,* 514 U.S. at 558–59, 115 S.Ct. 1624. Once again, however, the power is not unlimited and Congress does not have the authority to legislate matters that are of such a local character that there is too remote a connection to interstate commerce. *Id.* at 559, 115 S.Ct. 1624. Both parties also agree that, as broad as Congress' Commerce Power is, Congress may not use that power in such a way as to override or circumvent another constitutional restraint. *Ry. Labor Executives' Ass'n v. Gibbons,* 455 U.S. 457, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982) (striking down an act by Congress under the Commerce Clause that violated the Bankruptcy Clause's uniformity requirement). First Amendment Reply at 13; Opposition at 14.

Defendant argues that Congress exceeded its powers under the Intellectual Property Clause in enacting the DMCA. The government responds that Congress used its Commerce Power to regulate trafficking in devices for gain. Thus, the issue presented is whether the DMCA was within Congress' Commerce Power, generally, and if so, whether Congress was nevertheless prohibited from enacting the DMCA because of other restraints on Congress' power imposed by the Intellectual Property Clause.

■ With regard to the first issue, Congress plainly has the power to enact the DMCA under the Commerce Clause. "The commerce power 'is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extend, and acknowledges no limitations, other than are prescribed by the Constitution.'" *Lopez,* 514 U.S. at 553, 115 S.Ct. 1624 (citing *Gibbons v. Ogden,* 22 U.S. 1, 9 Wheat. 1, 196, 6 L.Ed. 23 (1824)). The DMCA prohibits conduct that has a substantial effect on commerce between the states and commerce with foreign nations. Trafficking in or the marketing of circumvention devices "for gain," as proscribed by Sections 1201(b) and 1204, has a direct effect on interstate commerce. To the extent that circumvention devices enable wrongdoers to engage in on-line piracy by unlawfully copying and distributing copyrighted works of authorship, the sale of such devices has a direct effect on suppressing the market for legitimate copies of the works. Accordingly, there is a rational basis for concluding that the regulated activity sufficiently affects interstate commerce to establish that Congress had authority under the Commerce Clause to enact the legislation. *Lopez,* 514 U.S. at 557, 115 S.Ct. 1624; *United States v. Moghadam,* 175 F.3d 1269, 1276–77 (11th Cir.1999) (finding the anti-bootlegging statute to have a sufficient connection to interstate and foreign commerce to meet the *Lopez* test).

The more difficult question, however, is whether Congress was nevertheless precluded from enacting the DMCA by restraints imposed by the Intellectual Property Clause. The Eleventh Circuit was presented with this same issue in the context of the anti-bootlegging statute in *Moghadam,* 175 F.3d 1269. The statute in that case prohibited persons from making unauthorized recordings of live performances, in effect, granting copyright-like

protection to live performances. The defendant challenged the constitutionality of the statute, contending that the Intellectual Property power extended only to "writings" and "inventions," and that a live performance was not a "writing." The government argued that the statute was a valid exercise of Congress' Commerce Power. In a well-reasoned opinion, the Eleventh Circuit first analyzed Supreme Court precedents that could be read to conflict with each other—*The Trade–Mark Cases*, 100 U.S. 82, 10 Otto 82 (1879), *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and *Railway Labor Executives' Association v. Gibbons*, 455 U.S. 457, 102 S.Ct. 1169, 71 L.Ed.2d 335 (1982)—and then resolved the tension in those cases to decide the case before it.

We note that there is some tension between the former line of cases (*Heart of Atlanta Motel*, the *Trade–Mark Cases* and *Authors League [of America, Inc. v. Oman*, 790 F.2d 220 (2d Cir.1986) ] ) and the *Railway Labor Executives* case. The former cases suggest that in some circumstances the Commerce Clause can be used by Congress to accomplish something that the [Intellectual Property] Clause might not allow. But the *Railway Labor Executives* case suggests that in some circumstances the Commerce Clause cannot be used to eradicate a limitation placed upon Congressional power in another grant of power.

*Moghadam*, 175 F.3d at 1279–80. The court then resolved the tension as follows:

[W]e take as a given that there are some circumstances, as illustrated by *Railway Labor Executives*, in which the Commerce Clause cannot be used by Congress to eradicate a limitation placed upon Congress in another grant of power. For the reasons that follow, we hold that the instant case is not one such circumstance. We hold that the

[Intellectual Property] Clause does not envision that Congress is positively forbidden from extending copyright-like protection under other constitutional clauses, such as the Commerce Clause, to works of authorship that may not meet the fixation requirement inherent in the term "Writings." The grant itself is stated in positive terms, and does not imply any negative pregnant that suggests that the term "Writings" operates as a ceiling on Congress' ability to legislate pursuant to other grants. Extending quasi-copyright protection to unfixed live musical performances is in no way inconsistent with the [Intellectual Property] Clause, even if that Clause itself does not expressly authorize such protection. Quite the contrary, extending such protection actually complements and is in harmony with the existing scheme that Congress has set up under the [Intellectual Property] Clause. A live musical performance clearly satisfies the originality requirement. Extending quasi-copyright protection also furthers the purpose of the [Intellectual Property] Clause to promote the progress of the useful arts by securing some exclusive rights to the creative author....

For the foregoing reasons, we conclude that extending copyright-like protection in the instant case is not fundamentally inconsistent with the fixation requirement of the [Intellectual Property] Clause. By contrast, the nonuniform bankruptcy statute at issue in *Railway Labor Executives* was irreconcilably inconsistent with the uniformity requirement of the Bankruptcy Clause of the Constitution.

*Id.*, 175 F.3d at 1280–81.

 Accordingly, *Moghadam* provides an instructive guide and analytical framework for resolving the constitutional question posed. If the statute passed by

Congress "is not fundamentally inconsistent with" the Intellectual Property clause and is otherwise within Congress' Commerce Power to enact, then the statute is not an unconstitutional exercise of congressional power. On the other hand, if the statute is "irreconcilably inconsistent" with a requirement of another constitutional provision, then the enactment exceeds congressional authority even if otherwise authorized by the Commerce Clause. With this teaching in mind, the court turns to the DMCA and the Intellectual Property Clause.

The first issue is to determine whether the DMCA is "not fundamentally inconsistent" with the purpose of the Intellectual Property Clause. The purpose of the Intellectual Property Clause is to promote the useful arts and sciences. Thus, the government is empowered to grant exclusive rights to inventors and authors in their respective inventions and original works of authorship, for limited times. This allows the inventor/author a reasonable time in which to reap the economic fruits of his or her inventive or creative labor. As a result of this economic incentive, people are encouraged to engage in inventive and originally expressive endeavors, thereby promoting the arts and sciences. In addition, because the grant of property rights is to be of limited duration, the public will generally benefit, once the exclusive rights expire and the invention or expression becomes dedicated to the public.

According to the government's brief, the DMCA and its legislative history demonstrate that Congress' intent was to protect intellectual property rights and thus promote the same purposes served by the Intellectual Property Clause. The government specifically argues that

[a]s reflected in the legislative history of the DMCA, Congress recognized that

while the purpose of the DMCA was to protect intellectual property rights, the means of doing so involved a dramatic shift from the regulation of the use of information to the regulation of the devices by which information is delivered. 144 Cong. Rec. E2136–2. For this reason, the legislators viewed the legislation as "paracopyright" legislation that could be enacted under the Commerce Clause. *Id.* at 2137. Such a step by Congress to protect the market for digital content as an action under the Commerce Clause cannot be said to override Constitutional restraints of the Intellectual Property Clause, because Congress' fundamental motivation was to protect rights granted under the Intellectual Property Clause in the digital world. Congress recognized that traditional intellectual property laws regulating the use of information border on unenforceable in the digital world; only regulation of the devices by which information is delivered will successfully save constitutionally guaranteed intellectual property rights. *See* S. Rep. 105–190, at 8 ("Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy.")

Opposition at 15.

▮▮▮ The argument carries some weight. Protecting the exclusive rights granted to copyright owners against unlawful piracy by preventing trafficking in tools that would enable widespread piracy and unlawful infringement is consistent with the purpose of the Intellectual Property Clause's grant to Congress of the power to "promote the useful arts and sciences" by granting exclusive rights to authors in their writings.[8] In addition,

8. Nevertheless, the argument also stretches too far. Under that same reasoning, Con-

Congress did not ban the use of circumvention tools out of a concern that enacting such a ban would unduly restrict the fair use doctrine and expressly sought to preserve fair use. *See* 17 U.S.C. § 1201(c). Therefore, on the whole, the DMCA's anti-device provisions are not fundamentally inconsistent with the Intellectual Property Clause.

The second half of the analysis is to determine whether the DMCA is nevertheless "irreconcilably inconsistent" with a limitation contained within the Intellectual Property Clause. Here, defendant and the amici curiae make several arguments, some of which have already been addressed. Defendant and the amici curiae contend that the DMCA is irreconcilably inconsistent with the Intellectual Property Clause because: 1) the Act eliminates fair use; 2) the Act allows publishers to recapture works from the public domain and obtain copyright-like protection in those works; and 3) the Act violates the "limited times" clause by effectively granting copyright owners perpetual rights to protect their works.

The first two contentions have been addressed, and rejected, above. While the DMCA may make certain fair uses more difficult for digital works of authorship published with use restrictions, fair use has not been eliminated. Similarly, the argument that Congress' ban on the sale of circumvention tools has the effect of allowing publishers to claim copyright-like protection in public domain works is tenuous and unpersuasive. Nothing within the DMCA grants any rights to anyone in any public domain work. A public domain work remains in the public domain and any

person may make use of the public domain work for any purpose.

Finally, the DMCA does not allow a copyright owner to effectively prevent an ebook from ever entering the public domain, despite the expiration of the copyright. *See* Amici EFF Brief at 16. Upon the expiration of the copyright, there is no longer any protectable intellectual property right in the work's expression. The expression may be copied, quoted, republished in new format and sold, without any legally enforceable restriction on the use of the expression. The publisher/copyright owner has no right to prevent any user from using the work any way the user prefers. At best, the publisher has a technological measure embedded within the digital product precluding certain uses of that particular copy of the work and, in many cases, the user/purchaser has acquiesced in this restriction when purchasing/licensing the work. *See* End User License Agreements, O'Connell Decl. Exhs. A–D. The essence of a copyright is the legally enforceable exclusive rights to reproduce and distribute copies of an original work of authorship, to make derivative works, and to perform the work publicly, for a limited period of time. 17 U.S.C. §§ 106, 302–303. None of those rights is extended beyond the statutory term merely by prohibiting the trafficking in or marketing of devices primarily designed to circumvent use restrictions on works in electronic form.

Accordingly, the DMCA does not run afoul of any restraint on Congress' power imposed by the Intellectual Property Clause. Section 1201(b) of the DMCA was within Congress' Commerce Power to en-

---

gress would be authorized to extend perpetual copyrights, a result plainly prohibited by the "Limited Times" clause. *See Moghadam* 175 F.3d at 1281 (noting that the "Limited Times" requirement of the Intellectual Property

clause forbids Congress from conferring intellectual property rights of perpetual duration, citing *Pennock v. Dialogue,* 27 U.S. (2 Pet.) 1, 16–17, 7 L.Ed. 327, 333 (1829)).

act, and because it is not irreconcilably inconsistent with any provision of the Intellectual Property Clause, Congress did not exceed its constitutional authority in enacting the law.

## CONCLUSION

For the foregoing reasons, defendant's motions to dismiss the indictment on constitutional grounds are DENIED.