**In re: VERIZON INTERNET SERVICES, INC., Subpoena Enforcement Matter,**

**Recording Industry Association of America, Plaintiff,**

v.

**Verizon Internet Services, Defendant.**

**No. CIV.A.02–MS–0323(JDB).**

United States District Court, District of Columbia.

Jan. 21, 2003.

Joe Robert Caldwell, Jr., Baker Botts, LLP, Washington, DC, for Alliance for Public Technolgy, Computer Professionals for Social Responsibility, Consumer Alert, Electronic Frontier Foundation (Eff), Media Access Project, National Grange, National Consumers League, Privacy Rights Clearinghouse, Privacyactivism, Public Knowledge, Utility Consumers' Action NetWork, Amici.

Donald B. Verrilli, Jr., Thomas J. Perrelli, Jenner & Block, Washington, DC, Jonathan Whitehead, Recording Industry Association of America, Washington, DC, for Recording Industry Association of America, Inc. (Riaa), Movant.

Timothy C. Hester, Covington & Burling, Washington, DC, for Verizon Internet Services, Inc., Movant.

Joe Robert Caldwell, Jr., Baker Botts, LLP, Washington, DC, for Electronic Privacy Information Center, Movant.

Megan E. Gray, Gray Matters, Washington, DC, for EFF & Samuelson Law, Technology & Public Policy Clinic at Boalt Hall, School of law, Amicus.

Paul B. Gaffney, Williams & Connolly, LLP, Washington, DC, for Motion Picture Association of America (MPAA), Movant.

Kathryn Schaefer Zecca, Robbins, Russell, Englert, Orseck & Untereiner, Washington, DC, for United States Internet Industry Association, The Computer & Communications Industry Association, Internet Service Providers' Association (South Africa), Yahoo!, Incorporated, Southern Star, Mercury Network, LLC, Netlink 2000 Inc., Zzapp! Internet Services, Smcnet LLC, Ice Communications Inc., Frontier and Citizens Communications, DM Solutions, Movants.

### MEMORANDUM OPINION

BATES, District Judge.

The Recording Industry Association of America ("RIAA")[1] has moved to enforce a subpoena served on Verizon Internet Services ("Verizon") under the Digital Millennium Copyright Act of 1998 ("DMCA" or "Act"), 17 U.S.C. § 512. On behalf of copyright owners, RIAA seeks the identity of an anonymous user of Verizon's service who is alleged to have infringed copyrights with respect to more than 600 songs offered for downloading over the Internet in a single day. The copyright owners (and thus RIAA) can discern the Internet Protocol address, but not the identity, of the alleged infringer—only the service provider can identify the user. Verizon argues that the subpoena relates to material transmitted over Verizon's network, not stored on it, and thus falls outside the scope of the subpoena power authorized in the DMCA. RIAA counters that the subpoena power under section 512(h) of the DMCA applies to all Internet service pro-

viders, including Verizon, whether the infringing material is stored on or simply transmitted over the service provider's network.

The case thus presents a core issue of statutory interpretation relating to the scope of the subpoena authority under the DMCA. The parties, and several *amici curiae*, agree that this is an issue of first impression of great importance to the application of copyright law to the Internet. Indeed, they concede that this case is presented as a test case on the DMCA subpoena power. Based on the language and structure of the statute, as confirmed by the purpose and history of the legislation, the Court concludes that the subpoena power in 17 U.S.C. § 512(h) applies to all Internet service providers within the scope of the DMCA, not just to those service providers storing information on a system or network at the direction of a user. Therefore, the Court grants RIAA's motion to enforce, and orders Verizon to comply with the properly issued and supported subpoena from RIAA seeking the identity of the alleged infringer.

### BACKGROUND

An assessment of this issue requires some understanding of both the DMCA and the subpoena served by RIAA on Verizon. Although the subpoena power is specifically delineated in section 512(h), that language cannot be isolated from the structure and purpose of the DMCA, and RIAA's subpoena to Verizon must be assessed in that context.

#### 1. The Digital Millennium Copyright Act

The DMCA amended chapter 5 of the Copyright Act, 17 U.S.C. § 501 *et seq.,* and

---

1. RIAA is the industry trade association for 'sound and music recordings, whose members create and distribute the overwhelming ma-

jority of all music sold in the United States. RIAA is authorized to enforce the copyrights of its members.

created a new section 512 entitled "Limitations on liability relating to material online." As the title indicates, the DMCA is designed primarily to limit the liability of Internet service providers for acts of copyright infringement by customers who are using the providers' systems or networks. Section 512 contains limitations on the liability of service providers for four general categories of activity set forth in subsections (a) through (d). The statute thereby creates a series of "safe harbors" that allow service providers to limit their liability for copyright infringement by users if certain conditions under the Act are satisfied. "The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory [copyright] infringement." S.Rep. No. 105–190, at 20 (1998).

Under the DMCA, an Internet service provider falls within one of these four subsections based on how the allegedly infringing material has interacted with the service provider's system or network. To qualify for a "safe harbor," the service provider must fulfill the conditions under the applicable subsection and the conditions of subsection (*i*), which includes the requirement that a service provider implement and inform its users of its policy to terminate a subscriber's account in cases of repeat copyright infringement. *See* 17 U.S.C. § 512(*i*)(1)(A). Under subsection (a), which Verizon contends is applicable here, if the service provider meets certain conditions it will not be liable for the user's copyright infringement when the service provider transmits the copyrighted material over its system or network:

(a) Transitory digital network communications.—A service provider shall not be liable ... for infringement of copyright by reason of the provider's transmitting, routing, or providing [Internet] connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections ....

*Id.* § 512(a). On the other hand, subsection (c), the other subsection most relevant here, pertains to copyrighted material that is **stored** on the service provider's network or system:

(c) Information residing on systems or networks at direction of users.—... A service provider shall not be liable ... for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider ....

*Id.* § 512(c)(1).[2] Under subsection (c), a service provider must also designate an agent to receive notifications of claimed infringement from copyright owners. *Id.* § 512(c)(2).

Of particular importance here, subsection (c)(3)(A) spells out requirements to be met by copyright owners for effective notification of copyright infringement under subsection (c). The notification of claimed infringement must be in a writing provided to the designated agent, and must include the following—a "signature of a person authorized to act on behalf of the [copyright] owner"; identification of the copyrighted work allegedly infringed (or a list

---

**2.** Subsection (b) covers "system caching," which is the temporary storage of allegedly infringing material on the provider's system or network, while subsection (d) relates to "information location tools," which refer or link users to an online location having infringing material through the use of "a directory, index, reference, pointer, [ ] hypertext link" or other information location tool. *Id.* §§ 512(b) & (d).

of multiple copyrighted works covered by a single notification); identification of the allegedly infringing material "that is to be removed or access to which is to be disabled," and information to enable the provider to locate the material; information to permit the provider to contact the complaining party; a statement of good faith belief that the use complained of is not authorized; and a "statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner." *Id.* § 512(c)(3)(A)(i)-(vi). This notification requirement is located within subsection (c), and there is no similar notification requirement within subsection (a) or elsewhere in section 512. The subsection (c)(3) notification requirement is referenced, however, in the conditions under both subsection (b) and subsection (d). *See id.* §§ 512(b)(2)(E) & (d)(3).

The DMCA also contains a novel provision in subsection (h)—which lies at the heart of the dispute before the Court—permitting a copyright owner to obtain and serve a subpoena on a service provider seeking the identity of a customer alleged to be infringing the owner's copyright. The subpoena is issued by the clerk of any United States District Court upon a request by the copyright owner (or one authorized to act on the owner's behalf) containing the proposed subpoena, "a copy of a notification described in subsection (c)(3)(A)," and a sworn declaration ensuring that the subpoena is solely to obtain the identity of the alleged infringer, which information will be used only to protect rights to the copyright. *Id.* § 512(h)(2). The subpoena, in turn, authorizes and orders the recipient service provider "to expeditiously disclose" information sufficient to identify the alleged infringer. *Id.* § 512(h)(3). The clerk "shall expeditiously issue" the subpoena if it is in proper form,

the declaration is properly executed, and "the notification filed satisfies the provisions of subsection (c)(3)(A)." *Id.* § 512(h)(4). The service provider, upon receipt of the subpoena, "shall expeditiously disclose" the information required by the subpoena to the copyright owner (or authorized person). *Id.* § 512(h)(5). The issuance, delivery and enforcement of subpoenas is to be governed (to the extent practicable) by the provisions of the Federal Rules of Civil Procedure dealing with subpoenas duces tecum. *Id.* § 512(h)(6).

## 2. RIAA's Subpoena to Verizon

On July 24, 2002, RIAA served a subpoena on Verizon seeking identifying information about an anonymous copyright infringer allegedly using Verizon's network to offer for downloading copyrighted songs through peer-to-peer software provided by KaZaA, without the copyright holders' authorization. *See* Motion to Enforce, Ex. A. Along with the subpoena, RIAA provided Verizon with a list of more than 600 files (predominantly individual songs, most by well-known artists) allegedly offered for downloading by the user on one day. *Id.,* Ex. B. The subpoena included the user's specified Internet Protocol (IP) address, to enable Verizon to locate the computer where the infringement occurred. In addition to the IP address, RIAA provided the time and date when the songs were downloaded and furnished a declaration, under penalty of perjury, that the information was sought in good faith and would only be used in connection with "protecting the rights" of RIAA members. *Id.,* Ex. B (letter from Whitehead to Crowder dated July 24, 2002). RIAA also requested that Verizon "remove or disable access to the infringing sound files." *Id.*

Verizon responded by letter refusing to comply with RIAA's subpoena. *Id.,* Ex. D (letter from Daily to Whitehead dated

Aug. 6, 2002). Verizon emphasized its view that the DMCA subpoena power applies only if the infringed material is stored or controlled on the service provider's system or network under subsection (c). *Id.* at pp. 2–3. Verizon stated: "The allegedly infringing contents of the [downloaded files] do not reside on any system or network controlled or operated by or for [Verizon], but ... are stored on the hardware of the Customer. Thus, neither § 512(c)(3)(A) nor § 512(h) is applicable for this reason alone." *Id.* According to Verizon, a subpoena under the DMCA is "conditioned" on notification under section 512(c)(3)(A), "and that provision is addressed to 'material that resides on a system or network *controlled or operated by or for [a] service provider.*'" *Id.* (emphasis in original). In contrast, Verizon stressed, it only provided the customer with Internet connectivity service. *Id.* Verizon also refused RIAA's request to terminate the user's Internet connection. *Id.* at 3. Verizon's position, therefore, is that because it only provided the alleged infringer with an Internet connection, it falls under subsection (a) of section 512, not under subsection (c), and it is thus outside the subpoena authority of subsection (h), which Verizon contends is limited to service providers storing material under subsection (c).

RIAA, on the other hand, is of the view that the DMCA subpoena power under section 512(h) applies to all service providers within the provisions of subsections (a) through (d), including Verizon in the instant case.[3] Given Verizon's refusal to comply with the subpoena, RIAA moved pursuant to 17 U.S.C. § 512(h)(6) and Fed. R.Civ.P. 45(c)(2)(B) to enforce the subpoena. Substantial briefing (including sub-missions by *amici curiae* on both sides) and a hearing followed.

## ANALYSIS

This case turns on the meaning and scope of the provisions of the DMCA. "As in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002); *see also United States v. Braxton-brown–Smith,* 278 F.3d 1348, 1352 (D.C.Cir.2002). The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 240, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). If so, and if the statutory scheme is "coherent and consistent," then the inquiry ceases. *Barnhart,* 534 U.S. at 450, 122 S.Ct. 941 (quoting *Robinson,* 519 U.S. at 340, 117 S.Ct. 843). Nonetheless, "[s]tatutory construction 'is a holistic endeavor,' and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (quoting *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)). Hence, "courts should disfavor interpretations of statutes that render language superfluous." *Connecticut Nat'l Bank,* 503 U.S. at 253, 112 S.Ct. 1146. But as the Supreme Court has explained:

[C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation,

---

**3.** Hence, RIAA submits that it does not matter for purposes of enforcement of the subpoena whether Verizon comes within subsection (a) or subsection (c) in this case; in either event, RIAA contends, the subpoena is valid.

and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.

*Id.* at 254, 112 S.Ct. 1146; *accord Ron Pair Enters., Inc.,* 489 U.S. at 241–42, 109 S.Ct. 1026; *United States v. Goldenberg,* 168 U.S. 95, 102–103, 18 S.Ct. 3, 42 L.Ed. 394 (1897). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat'l Bank,* 503 U.S. at 254, 112 S.Ct. 1146 (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *see also Ratzlaf v. United States,* 510 U.S. 135, 147–48, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("There are, we recognize, contrary indications in the statute's legislative history. But we do not resort to legislative history to cloud a statutory text that is clear."); *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992).

 Here, the statutory language and structure lead to a single result—the section 512(h) subpoena authority applies to service providers within not only subsection (c) but also subsections (a), (b), and (d) of section 512. Moreover, the purpose and history of the DMCA are consistent with that conclusion.

### 1. Statutory Definition of "Service Provider"

The statutory text of the DMCA provides clear guidance for construing the subpoena authority of subsection (h) to apply to all service providers under the Act. The term "service provider" is employed repeatedly in subsection (h). The request to the clerk is "to issue a subpoena to a service provider for identification of an alleged infringer" (§ 512(h)(1)); the

subpoena "shall authorize and order the service provider receiving the notification and the subpoena" to disclose the identifying information to the extent it is available to the service provider (§ 512(h)(3)); a proper subpoena shall be executed by the clerk, who shall return it to the requester "for delivery to the service provider" (§ 512(h)(4)); and upon receipt "the service provider shall expeditiously disclose" the information required by the subpoena "regardless of whether the service provider responds to the notification" (§ 512(h)(5)).

The question, then, is whether the "service provider" repeatedly referenced in subsection (h) is limited to one described by subsection (c) or instead includes those described in subsections (a), (b) and (d) of section 512 as well. The DMCA answers that question unequivocally.

The Act provides two distinct definitions of "service provider"—a narrow definition as the term is used solely within subsection (a), and a broader definition governing all other subsections, which specifically includes a "service provider" under subsection (a) as well:

(k) Definitions. -

(1) Service provider. -

(A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

(B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor,

and includes an entity described in subparagraph (A).

17 U.S.C. § 512(k); *see also ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 623 (4th Cir.2001) (the DMCA "defines a service provider broadly").

The textual definition of "service provider" in subsection (k) leaves no doubt, therefore, that the subpoena power in subsection (h) applies to all service providers, regardless of the functions a service provider may perform under the four categories set out in subsections (a) through (d). The broad definition in subsection (k)(1)(B)—"a provider of online services or network access"—expressly applies to the term "service provider" as used in subsection (h), since the narrow definition found in subsection (k)(1)(A) is applicable only to the term as used in subsection (a). By the plain text of the statute, moreover, the term "service provider" as employed in subsection (h) encompasses those entities defined in subsection (k)(1)(A), which explicitly includes "service providers" under subsection (a) such as Verizon (an "entity offering the transmission, routing, or providing of connections for digital online communications"). In short, Verizon contends that it has only provided an Internet connection, and thus is within subsection (a) of the DMCA; but the definition of "service provider" in subsection (k) applicable to the subpoena authority under subsection (h) squarely includes subsection (a) entities such as Verizon that are "providing . . . connections for digital online communications." Given the broad definition

of "service provider" in subsection (k)(1)(B), and the use of that defined term throughout subsection (h), the Court must, under well-established statutory construction tools, read these provisions together, as a whole. *See United States v. Wilson*, 290 F.3d 347, 355 (D.C.Cir.2002) ("It is the 'classic judicial task' of construing related statutory provisions 'to make sense in combination.' ") (quoting *United States v. Fausto*, 484 U.S. 439, 453, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988)). Applying the statutory definition of "service provider" leaves no doubt whatsoever, then, that the DMCA subpoena authority reaches a subsection (a) service provider such as Verizon contends it is here.[4]

Verizon's response is to downplay the subsection (k) definition, dismissing it as "beside the point." But the language is clear, and the Court cannot overlook the governing definition of service provider in subsection (k)(1)(B), which plainly sets the scope of the subsection (h) subpoena power. Rather, the Court must take into account all relevant parts of the statute. *See United States Telecom Ass'n v. FCC*, 227 F.3d 450, 463 (D.C.Cir.2000) (noting "the well-accepted principle of statutory construction that requires every provision of a statute to be given effect"); *Qi–Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C.Cir.1995) (courts have "endlessly reiterated [the] principle of statutory construction . . . that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage"). "If a statute

---

**4.** The legislative history of the DMCA comports with this reading of the definitional language of subsection (k). The Senate Report explains that "[t]he second definition of 'service provider,' set forth in subsection (j)(1)(b), applies to the term as used in any other subsection of section 512." S.Rep. No. 105–190, at 54 (subsection (j)(1)(b) ultimately became subsection (k)(1)(B)). "This definition includes, for example, services such as pro-

viding Internet access, e-mail, chat room and web page hosting services," and "[t]he definition also specifically includes any entity that falls within the first definition of service provider." *Id.* at 54–55. *See also* H.R.Rep. No. 105–551(II), at 64 (1998) (definition of "service provider" "includes, for example, services such as providing Internet access, email," etc.).

defines a term in its definitional section, then that definition controls the meaning of the term wherever it appears in the statute." *Lilly v. Internal Revenue Service,* 76 F.3d 568, 571 (4th Cir.1996); *see also Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) ("[A] definition which declares what a term 'means' ... excludes any meaning that is not stated."); *Florida Dep't of Banking & Fin. v. Board of Governors of Fed. Reserve Sys.,* 800 F.2d 1534, 1536 (11th Cir.1986) ("It is an elementary precept of statutory construction that the definition of a term in the definitional section of a statute controls the construction of that term wherever it appears throughout the statute."). It would simply make no sense here to dismiss the statutory definition of "service provider" as irrelevant.

As Verizon explained in its letter to RIAA refusing to comply with the subpoena, "the only service [Verizon] provides to the Customer is Internet connectivity." Motion to Enforce, Ex. D, at p. 2 (letter from Dailey to Whitehead dated Aug. 6, 2002). But the broad definition of "service provider" under subsection (k)(1)(B) that is expressly applicable to subsection (h), together with the fact that Verizon indisputably provided network access to the alleged infringer, lead ineluctably to the conclusion that the subpoena authority of the DMCA applies to all service providers within the scope of the Act, including those like Verizon falling under subsection (a).

### 2. The Statutory Structure

Verizon's assertions to the contrary are refuted by the structure and language of the DMCA. An essential condition for a valid subpoena under subsection 512(h), Verizon claims, "is a notification to the service provider that complies with subsection (c)(3)(A)." Verizon Opp. at pp. 2–3. Therefore, Verizon argues, it is implicit

that a subpoena may only be issued to service providers described in subsection (c)—in other words, "to [those] service providers who have stored offending material on their own system or network." *Id.* at p. 3. Verizon notes that, in contrast, "subsection (a)—the provision of section 512 for service providers acting simply as passive transmitters, as Verizon was here—contains no provision for any notification of claimed infringers, much less notification that 'satisfies the requirements of (c)(3)(A).'" *Id.* Thus, Verizon reasons, RIAA's subpoena to it is invalid because Verizon is not storing the infringing material on its system or network, but is simply providing "Internet connectivity" or acting as a "passive conduit" under subsection (a), and hence need not comply with the notification requirement in subsection (c)(3)(A).

The Court disagrees with Verizon's strained reading of the Act, which disregards entirely the clear definitional language of subsection (k). The holistic character of statutory construction requires an examination of all relevant text, and of language as well as structure. *See Connecticut Nat'l Bank,* 503 U.S. at 254, 112 S.Ct. 1146. Not only the language but also the structure of the DMCA dispenses with the contentions advanced by Verizon.

Verizon contends that the Court should infer that the subpoena authority under subsection (h) only applies to subsection (c) in light of the reference in subsection (h)(2)(A) to the notification requirement of subsection (c)(3)(A). But that reference does not mean that subsection (h) only applies to service providers described in subsection (c). In fact, the notification provision in subsection (c) is also referenced elsewhere in the DMCA, including in subsections (b)(2)(E) and (d)(3). The latter references confirm the expectation that notifications like that described in

subsection (c)(3) will at times be needed in settings under subsections (b) and (d), and hence are not confined to subsection (c) settings. Subsection (h), moreover, is written without limitation or restriction as to its application. It is entitled "Subpoena to identify infringer"—not "Subpoena to identify infringer storing copyrighted material on a service provider's network" or "Subpoena to identify infringer relating to subsection (c)." If Congress intended to restrict or limit the subsection (h) subpoena authority based on where the infringing material resides, one would expect to see that limitation spelled out in subsection (h). And if Congress intended to limit subsection (h) subpoenas strictly to service providers under subsection (c), it certainly could have made such a limitation explicit.

There is simply nothing in the text of the statute that states, or even suggests, that the subpoena authority in subsection (h) applies only to those service providers described in subsection (c). Indeed, subsection (h) does not require, as Verizon contends, a copyright owner to comply fully with subsection (c)(3)(A). The references in subsection (h) to "a notification described in" (*see* §§ 512(h)(2)(A) & (h)(5)) or that "satisfies the provisions of" (*see*

§ 512(h)(4)) subsection (c)(3)(A) do not by their language limit the subpoena authority. Rather, these references are consistent with the construction that when a subpoena under subsection (h) is sought against a service provider falling within subsections (a), (b) or (d), the copyright owner or authorized person must then provide a notification like the one always required under subsection (c) but not otherwise required under (a), (b) or (d). Thus, as part of the process to obtain a subpoena, subsection (h)(2)(A) simply requires a copyright owner to file with the clerk the type of "notification described in subsection (c)(3)(A)."

Significantly, then, if Congress had intended subsection (h) subpoenas to apply solely to subsection (c) service providers, it could have stated such a limitation in subsection (h), or stated that subsection (h) does not apply to subsections (a), (b) or (d), or even have placed the subpoena authority itself within subsection (c). But Congress did not do so. Instead, the subpoena authority in the DMCA is contained in a stand-alone subsection, just as separate from subsection (c) as it is from subsections (a), (b), and (d).[5] It is a "funda-

---

5. Verizon also points out that under subsection (c)(3)(A)(iii) a copyright owner must identify the infringing material "that is to be removed or access to which is to be disabled." In order to remove or disable access to the material, Verizon argues, the material must be stored on its system—an indication that Congress intended subsection (h) to apply only to those service providers who store infringing material on their systems. The Court is not persuaded. To begin with, a subpoena issued pursuant to subsection (h) is used to identify the infringer, not to force the service provider to remove material or disable access to it. The requirement for the notification is simply that it identify the infringing material to be removed, not that removal be effectuated. In addition, a copyright owner can meet the requirement under subsection (c)(3)(A)(iii) if it can disable access to material. Here,

Verizon certainly can disable access to the material by terminating the account altogether. Verizon makes clear to customers in its terms of service that the use of its network for copyright infringement is strictly forbidden, and can result in a variety of sanctions, including termination. In fact, the DMCA *requires* service providers, in order to obtain the various safe harbor protections, to implement "a policy that provides for termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(*i*)(1)(A). Verizon counters that terminating service is too harsh, and may prevent other family members from having Internet service. But again, the requirement is only identification of infringing material, not actual removal or access denial. There is nothing, moreover, to prevent a family mem-

mental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000).

Verizon's proposed construction does not comport with other aspects of the Act either. A court must consider "the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). There is no discernable reason why Congress would limit the subpoena authority under subsection (h) to subsection (c) service providers alone. To begin with, the burden on a service provider in identifying an apparent infringer is no different depending on which subsection of 512 is implicated.[6] Indeed, considering the four-part structure of the liability limitations under the DMCA, subsections (a) through (d) together with the subpoena authority under subsection (h) only "make sense in combination" if construed so that the subpoena authority extends to service providers in all four categories. *See Fausto*, 484 U.S. at 453, 108 S.Ct. 668; *Wilson*, 290 F.3d at 355. Otherwise, the statute would fail significantly to address many contexts in which a copyright owner needs to utilize the subpoena process in order to discern the identity of an apparent copyright infringer. And although Verizon has attempted to justify an exclusion of just subsection (a) service providers from the reach of the subpoena authority, the position advanced by Verizon logically supports confining the subpoena authority to subsection (c) service providers alone, whereas the statutory language and structure certainly provide no basis for differentiating service providers within subsection (a) from those within subsections (b) and (d) as to the scope of the subpoena power. Moreover, whatever rationale warrants distinguishing among subsections (a) through (d) for purposes of the safe harbor liability protections, there is no corresponding rationale for such distinctions regarding a subpoena power that entails merely identifying infringers.

Importantly, Verizon's construction does not square with Congress's express and repeated direction to make the subpoena process "expeditious." *See, e.g.*, 17 U.S.C. §§ 512(h)(3), (h)(4) & (h)(5) (subpoena shall require service provider to expeditiously disclose identity of infringer; clerk shall expeditiously issue subpoena; and service provider shall expeditiously disclose identity of infringer upon receipt of subpoena). The statute contemplates a rapid subpoena process designed quickly to identify apparent infringers and then curtail the infringement. The copyright holder, however, cannot readily determine whether its infringed material was stored on or merely transmitted across the service provider's system, and hence whether

---

ber from opening another account. In any event, it is irrelevant whether the service provider is able, or intends, to disable access to the material. *See id.* § 512(h)(5) ("service provider shall expeditiously disclose to the copyright owner ... the information required by the subpoena, ... regardless of whether the service provider responds to the notification").

**6.** Arguably, the total burden on service providers may be heavier from subpoenas relating to subsection (a), as there may be more infringement occurring with subsection (a) service providers than with subsection (c) service providers. But in exchange for complying with subpoenas under subsection (h), service providers receive liability protection from any copyright infringement—direct or vicarious—by their users. Hence, any additional burden is offset by that protection, which, of course, is exactly the contemplation reflected in the structure of the DMCA.

it faces a subsection (c) or subsection (a) situation. As a result, if the copyright owner could only utilize the subpoena process for subsection (c) service providers, it would have to establish at the outset that the service provider fell within subsection (c) in the particular case at hand. Hence, in many instances an initial contested factual issue would ensue in court with respect to where the material is stored, resulting in potentially lengthy delays in obtaining identifying information about the infringer. Such complication and delay hardly comports with the language peppered throughout subsection (h) indicating that the subpoena process should be "expeditious." In fact, there is an important reason why Congress required service providers to act promptly upon receipt of a subpoena to prevent further infringement—"the ease with which digital works can be copied and distributed worldwide virtually instantaneously." S.Rep. No. 105–190, at 8.[7]

Verizon's construction thus makes little sense from a policy standpoint. Verizon has provided no sound reason why Congress would enable a copyright owner to obtain identifying information from a service provider storing the infringing material on its system, but would not enable a copyright owner to obtain identifying information from a service provider transmitting the material over its system (or, indeed, from a service provider engaged in system caching under subsection (b) or providing information location tools under subsection (d)). After all, the information obtained simply permits the copyright owner to take steps directly with the infringer to prevent further infringement. It is unlikely, the Court concludes, that Congress would seek to protect copyright owners in only some of the settings addressed in the DMCA, but not in others.

In short, Verizon's position that the subpoena power in subsection (h) only applies to subsection (c) service providers, and not to subsection (a) (or for that matter to subsections (b) and (d)) service providers, would create a huge loophole in Congress's effort to prevent copyright infringement on the Internet. There is little doubt that the largest opportunity for copyright theft is through peer-to-peer ("P2P") software, as used by the alleged infringer here. One *amici* characterizes such P2P software as "the biggest revolution to happen on the Internet since the advent of email or the World Wide Web—millions of individuals use P2P now, and the number is growing exponentially." Br. of *Amicus Curiae* U.S. Internet Service Provider Assoc. at p. 6. Even Verizon states that "more than 100 million copies of [KaZaA's] peer-to-peer file sharing software have been downloaded, and more than two million of its users are commonly online at any given time." Verizon Opp. at p. 8. Because peer-to-peer users most often swap materials over the Internet that are stored on their own computers—not on the service providers' networks—such activity is within subsection (a), not subsection (c). Thus, under Verizon's reading of the Act, a significant amount of potential copyright infringement would be shielded from the subpoena authority of the DMCA.[8] That would, in ef-

---

7. The consequence of delaying the receipt of information identifying an infringer was highlighted by *amicus curiae* Motion Picture Association of America. If Warner Brothers sought to obtain by subpoena information identifying an alleged infringer disseminating the latest Warner Brothers' movie release over the Internet, but needed first to establish that the movie was stored on the service provider's system, the movie could be distributed all over the world in the meantime, dramatically diminishing the value of the copyright.

8. Verizon recognizes the extent of this resulting loophole. In addressing the burden on service providers if subsection (h) applied to

fect, give Internet copyright infringers shelter from the long arm of the DMCA subpoena power, and allow infringement to flourish. The Court can find nothing in the language or structure of the statute that suggests Congress intended the DMCA to protect only a very limited portion of copyrighted material on the Internet.

### 3. The Purpose and History of the DMCA

"The traditional tools [of statutory construction] include examination of the statute's text, legislative history, and structure, as well as its purpose." *Natural Resources Defense Council, Inc., v. Daley,* 209 F.3d 747, 752 (D.C.Cir.2000). Here, the text and structure of the DMCA are clear, as explained above, and "we do not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States,* 510 U.S. at 147–48, 114 S.Ct. 655. Nonetheless, common sense suggests that an assessment of the subpoena authority under the DMCA may benefit from an understanding of the purpose and history of the legislation. *See Wisconsin Public Intervenor v. Mortier,* 501 U.S. 597, 611 n. 4, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991).

■ Congress not only sought to limit the liability of service providers under the DMCA, but also intended to assist copyright owners in protecting their copyrights. The legislative history makes clear

that in enacting the DMCA, Congress attempted to balance the liability protections for service providers with the need for broad protection of copyrights on the Internet.[9] The clear purpose of the DMCA, evident in its legislative history, confirms that the scope of the subsection (h) subpoena power extends to service providers within subsection (a) as well as subsection (c).

The dual purpose and balance of the DMCA has been recognized by the courts. The Fourth Circuit has explained that "[t]he DMCA was enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider." *ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239 F.3d 619, 625 (4th Cir.2001). Other courts note this balancing as well. "Congress was concerned with promoting electronic commerce while protecting the rights of copyright owners, particularly in the digital age where near exact copies of protected works can be made at virtually no cost and distributed instantaneously on a worldwide basis." *United States v. Elcom Ltd.,* 203 F.Supp.2d 1111, 1124 (N.D.Cal. 2002) (citing S.Rep. No. 105–190, at 8). In short, Congress sought "to protect against unlawful piracy and promote the development of electronic commerce and the

subsection (a), Verizon conceded at oral argument that far more infringement occurs with subsection (a) service providers: "There are, under subsection (a), far greater number of uses, e-mail, for instance, is part of subsection (a). The whole Internet is potentially drawn into subsection (a)." Tr. of Hearing (Oct. 4, 2002) at p. 61. Indeed, as one District Court observed in construing an unrelated provision of the DMCA, "piracy of intellectual property has reached epidemic proportions." *United*

*States v. Elcom Ltd.,* 203 F.Supp.2d 1111, 1132 (N.D.Cal.2002).

**9.** To the extent the statutory language in the DMCA is unclear, "the legislative history of the DMCA can be useful in fleshing out its meaning given the paucity of precedent interpreting the statute." *Costar Group, Inc. v. Loopnet, Inc.,* 164 F.Supp.2d 688, 700 (D.Md. 2001).

availability of copyrighted material on the Internet." *Id.* at 1125.

Congress thus created tradeoffs within the DMCA: service providers would receive liability protections in exchange for assisting copyright owners in identifying and dealing with infringers who misuse the service providers' systems. At the same time, copyright owners would forgo pursuing service providers for the copyright infringement of their users, in exchange for assistance in identifying and acting against those infringers.

> Title II [of the DMCA] preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

S.Rep. No. 105–190, at 20. "[T]he Committee believes it has appropriately balanced the interests of content owners, online and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet." H.R.Rep. No. 105–551(II), at 21; *see also* H.R.Rep. No. 105–551(I), at 11 (noting that remedies "ensur[e] that it is possible for copyright owners to secure the cooperation of those with the capacity to prevent ongoing infringement").[10] In striking this balance, Congress was driven by the observation that unless copyright owners have the ability to protect their copyrights on the Internet, they will be less likely to make their works available online:

Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy.... [This legislation] will facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of the American creative genius.

S.Rep. No. 105–190, at 8.

Congress also recognized that the Internet created unprecedented opportunities for copyright infringement, and sought to provide assistance to copyright owners in light of the technological developments surrounding the Internet:

Copyright laws have struggled through the years to keep pace with emerging technology from the struggle over music played on a player piano roll in the 1900's to the introduction of the VCR in the 1980's. With this constant evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials.... Title II [of the DMCA] clarifies the liability faced by service providers who transmit potentially infringing material over their networks. In short, Title II ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will expand.

S.Rep. No. 105–190, at 1–2. As Senator Leahy explained, "[t]he DMCA is a product of the Senate Judiciary Committee's recognition that ours is a time of unprece-

---

**10.** "The DMCA affects [service providers'] liability by insulating [providers] from liability as long as they comply with certain statutory requirements designed to facilitate content providers' efforts to protect their copyrighted material." A. Yen, *Internet Service Provider Liability for Subscriber Copyright Infringement, Enterprise Liability, and the First Amendment,* 99 Geo.L.J. 1833, 1881 (2000).

dented challenge to copyright protection. . . . This bill is a well-balanced package of proposals that address the needs of creators, consumers and commerce in the digital age and well into the next century." *Id.* at 68.

Congress was concerned about the ability of copyright owners to protect their creative investments in light of rapid technological innovations on the Internet that make copyright theft easy, virtually instantaneous, and undetectable. Therefore, in exchange for the liability protections afforded to service providers in subsections (a) through (d) of the DMCA, Congress sought through subsection (h) to require service providers to assist copyright owners in identifying infringers using the service providers' systems. If, as Verizon contends, service providers only have such obligations when the infringing material is stored on their systems, then service providers falling within subsection (a)—a large portion of those addressed by the DMCA—would receive the liability protections of the Act without the corresponding obligation to assist copyright owners in identifying infringers. There is no logical connection between the line Verizon seeks to draw and the objectives Congress sought to achieve through the DMCA. Verizon's reading would thus undermine the balance Congress established in the DMCA, and does not comport with the Act's purpose and history.[11] It is not for this Court to second-guess the compromises, negotiations, or even brokered deals that produced the DMCA; rather, the Court's role is to interpret the statute as enacted by Congress, and the clear language and structure of the DMCA must therefore control. *See Barnhart,* 534 U.S. at 460–61, 122 S.Ct. 941.

Complicating this assessment somewhat is the fact that two new technology developments underlying the issues in this case—peer-to-peer (P2P) software and "bots," a software tool used by copyright owners to monitor the Internet and detect unauthorized distribution of copyrighted material—were "not even a glimmer in anyone's eye when the DMCA was enacted" by Congress in 1998.[12] RIAA contends that P2P software makes Internet copyright piracy easy and immediate, while Verizon counters that "bots" will inundate service providers with thousands of computer-generated subpoenas seeking to identify infringers. Whether or not Congress was able to anticipate these technologies in enacting the DMCA, however, the courts cannot read new provisions or exceptions into a statute in order to accommodate future technological developments. Particularly in the field of copyright, federal courts must defer to Congress' expertise and constitutional authority.

The Constitution assigns to Congress the authority to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const., art. I, § 8, cl. 8. The Supreme Court has long deferred to Congress on the scope and nuances of copyright law, especially regarding new technologies:

Sound policy, as well as history, supports our consistent deference to Con-

---

**11.** This balance was adopted with substantial input from the service providers. In fact, the large service providers, including AOL and others, were heavily involved in negotiating these tradeoffs in the legislation. "Title II, for example, reflects 3 months of negotiations supervised by Chairman Hatch and assisted by Senator Ashcroft among the major copyright owners and the major OSP's and [Internet Service Providers]." S.Rep. No. 105–190, at 9.

**12.** Br. of *Amicus Curiae* Alliance for Public Technology, *et al.,* at p. 6.

gress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the varied permutations of competing interests that are inevitably complicated by such new technology.

*Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984); *see also Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394, 414, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974) ("Detailed regulation of these relationships, and any ultimate resolution of the many sensitive and important problems in [the copyright] field, must be left to Congress."); *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 401, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968) (Court refused "to render a compromise decision ... [to] accommodate various competing considerations of copyright, communications, and antitrust policy. We decline that invitation. That job is for Congress."). As recently as last week, the Supreme Court reiterated that "we defer substantially to Congress" on copyright law, that "we are not at liberty to second-guess congressional determinations and policy judgments" regarding copyright issues, and that "it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives." *Eldred v. Ashcroft,* — U.S. ——, 123 S.Ct. 769, 772, 782, 785, 154 L.Ed.2d 683 (2003) (citing *Sony Corp.,* 464 U.S. at 429, 104 S.Ct. 774, and *Stewart v. Abend,* 495 U.S. 207, 230, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990)).

Notwithstanding these technological advancements, then, this Court will not attempt to re-balance the competing interests among service providers and copyright holders to address P2P software or "bots" that can roam the Internet detecting infringing material. As the Supreme Court stated in *Fortnightly,* "[t]hat job is for Congress." 392 U.S. at 401, 88 S.Ct. 2084. To date, Congress has spoken through the text, structure and purpose of the DMCA, under which, the Court concludes, RIAA's subpoena to Verizon meets the requirements spelled out in subsection (h) and therefore is valid.[13]

### 4. "John Doe" Actions As an Alternative

Verizon maintains that under its construction of the DMCA, with the subsection (h) subpoena power limited to service providers under subsection (c), owners would still have an adequate means to protect their copyrights. Verizon suggests that as an alternative RIAA may bring a "John Doe" action in federal court to obtain information identifying copyright infringers who, under subsection (a) of the DMCA, transmit infringing material over a service provider's network. As Verizon sees it, the copyright owner would file a complaint against John Doe, the unnamed infringer, and a third-party subpoena would then be issued and served on the service provider pursuant to Fed.R.Civ.P. 45. The service provider would then inform John Doe (its customer) of the lawsuit. Under this process, Verizon asserts, there would be protections, both procedur-

---

**13.** Verizon has not challenged RIAA's subpoena to Verizon on the ground that it does not meet the notification requirements under subsections (c)(3)(A) or (h)(2). RIAA provided a notification described in (c)(3)(A), including the identity of the copyright works infringed, a statement in good faith that the use of the

works is not authorized, and a sworn declaration that the purpose of the subpoena is to obtain the identity of the infringer and that the information will only be used to protect rights to the copyright. *See* Motion to Enforce, Ex. B.

al and substantive, for the user's rights, and service providers would have the opportunity to seek to quash the subpoena.

The short answer to Verizon's suggestion is that there is absolutely nothing in the DMCA or its history to indicate that Congress contemplated copyright owners utilizing John Doe actions in federal court to obtain the identity of apparent infringers, rather than employing the subsection (h) process specifically designed by Congress to address that need. Moreover, as Verizon concedes, the burden on service providers is certainly no greater with a DMCA subpoena than with a Rule 45 third-party subpoena.

The additional burden on copyright owners, however, would be considerable, given the effort and expense associated with pursuing such John Doe suits in court. Congress has noted the vast extent of copyright piracy over the Internet, and growing numbers of suits involving disputes over the sufficiency of allegations of infringement and other issues would, in turn, likely undermine the determination of copyright owners to prosecute such actions. Importantly, the time and delay associated with filing complaints and pursuing third-party subpoenas in court would undermine the ability of copyright owners to act quickly to prevent further infringement of their copyrights. That is at odds with the design of Congress through the DMCA, which commands "expeditious" issuance of and response to subpoenas under subsection (h). Moreover, Verizon overlooks altogether the burden on the federal courts from large numbers of such actions. Federal courts have exclusive jurisdiction over copyright actions, and considering the extent of Internet copyright piracy could become inundated with John Doe actions seeking the identity of copyright infringers. *See NBC, Inc. v. Copyright Royalty Tribunal,* 848 F.2d

1289, 1295 (D.C.Cir.1988) ("the federal courts ... have exclusive jurisdiction over actions 'arising under' the Copyright Act, such as infringement actions"). Undoubtedly, the John Doe actions contemplated by Verizon would be more complex (involving three-party litigation) and time consuming than occasional enforcement actions for DMCA subpoenas.

Not only are John Doe actions more burdensome and less timely, but in several important ways they are less protective of the rights of service providers and Internet users than is the section 512(h) process. The DMCA mandates that a copyright holder fulfill several requirements under subsection (h) before the holder can obtain information from the service provider identifying the infringer. These protections ensure that a service provider will not be forced to disclose its customer's identifying information without a reasonable showing that there has been copyright infringement. Thus, to obtain a subsection (h) subpoena a copyright owner must have a "good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," § 512(c)(3)(A)(v), and must provide a "statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed," § 512(c)(3)(A)(vi). Moreover, Congress required a copyright owner to submit

> a sworn declaration to the effect that the purpose for which the subpoena is sought is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of protecting rights under this title.

17 U.S.C. § 512(h)(2)(c). These requirements provide substantial protection to service providers and their customers against overly aggressive copyright own-

ers and unwarranted subpoenas. Indeed, they provide greater threshold protection against issuance of an unsupported subpoena than is available in the context of a John Doe action. And, of course, nothing in the DMCA precludes a service provider from raising non-compliance or other objections to a subsection (h) subpoena. *See, e.g., ALS Scan, Inc. v. RemarQ Communities, Inc.,* 239 F.3d 619 (4th Cir.2001) (action addressing service provider's resistance to subpoena for non-compliance with the DMCA).[14]

Given these various protections incorporated into the DMCA subpoena process,[15] the Court concludes that Verizon's suggestion that John Doe actions are an adequate alternative remedy is not convincing. There is nothing in the DMCA to indicate that Congress intended that result. Such actions would be unworkable, far too slow, and uneconomical for copyright holders, and much too burdensome for the federal courts. Congress did not, in the Court's view, contemplate some service providers subject to the DMCA facing expeditious

subsection (h) subpoenas, while others would only have to provide information identifying infringers through the slower, more cumbersome process of a John Doe action. Indeed, Verizon's suggestion would mean subpoenas under subsection (h)—if limited to subsection (c) service providers—would be delayed by complex factual issues involving whether a subsection (c) setting was actually presented, while subpoenas to all other service providers would be pursuant to even more burdensome, and slower, John Doe actions. Such a cumbersome, dual structure is flatly inconsistent with the "expeditious" subsection (h) subpoena process, and would run a serious risk of dissuading copyright owners from seeking the identity of apparent infringers and protecting their copyrights.[16] That result would be contrary to Congressional intent as evidenced in the text, structure and history of the DMCA.

## 5. The DMCA and the Constitution

A number of possible constitutional challenges to the subsection (h) subpoena pow-

---

**14.** The DMCA also provides disincentives for false representations under the Act, making it costly for anyone to seek a subpoena on the basis of intentional misrepresentations, and thereby further ensuring that subpoenas will only be used in circumstances of good faith allegations of copyright infringement. Subsection (f) of the Act provides:

> Misrepresentations—Any person who knowingly materially misrepresents under this section (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer ... or by a service provider, who is injured by such misrepresentations, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing
> . . . .

17 U.S.C. § 512(f).

**15.** Indeed, the requirements for obtaining a section 512(h) subpoena are precisely the type of procedural requirements that other courts have imposed for subpoenas on service providers to identify anonymous posters of messages on the Internet. *See Doe v. 2TheMart.Com. Inc.,* 140 F.Supp.2d 1088, 1095 (W.D.Wash.2001) (party seeking subpoena to service provider to identify anonymous nonparty must show subpoena sought in "good faith" and that identifying information sought is directly and materially relevant to core claim and unavailable from any other source); *see also Columbia Ins. Co. v. Seescandy.Com,* 185 F.R.D. 573, 578–79 (N.D.Cal.1999).

**16.** When the Court asked Verizon's counsel whether John Doe actions might be so expensive that they would "scare off" copyright owners, he responded that "[t]here is that possibility" given the protections and "hoops that have to be gone through under the John Doe suits." Tr. of Hearing (Oct. 4, 2002) at p. 62.

er have been identified by *amici curiae*. Verizon, however, does not assert that the subpoena power in subsection (h), as applied to service providers (like Verizon) under subsection (a), is unconstitutional; instead, Verizon merely states that it "raises substantial questions."[17] RIAA accordingly has not fully briefed the various constitutional issues raised by the *amici curiae* supporting Verizon. Hence, the Court is without the benefit of full development of these issues by the parties.

 Unless raised by the parties, a court normally should not entertain statutory or constitutional challenges asserted solely by *amici*. *See, e.g., A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 266 (3rd Cir.2001) ("Although the Cato Institute, *amicus curiae* for plaintiffs, argues constitutional claims, new issues raised by an *amicus* are not properly before the court in the absence of exceptional circumstances.") (quoting *General Eng'g Corp. v. Virgin Islands Water and Power Auth.*, 805 F.2d 88, 92 (3rd Cir. 1986)). Indeed, in construing the DMCA, the Second Circuit refused to consider a constitutional challenge briefly addressed by the defendant in a footnote, although fully examined by an *amicus*. *See Universal City Studios, Inc. v. Corley*, 273 F.3d 429 (2nd Cir.2001). Without a "properly developed record," the court found that the defendant effectively waived the constitutional challenge: "Although an *amicus* brief can be helpful in elaborating issues properly presented by the parties, it is normally not a method for injecting new issues ..., at least in cases where the

parties are competently represented by counsel." *Id.* at 445. Here, because Verizon is not raising any explicit constitutional challenge to the DMCA, the Court is wary of considering such issues.[18]

Even if the Court were to consider a constitutional challenge here, it must be noted that any constitutional problems faced by service providers or their customers would exist under Verizon's construction of the DMCA as well. The Court's authority and users' anonymity are equally at issue with subsection (c) as with subsection (a), and the First Amendment interest—the identity of the user—is identical no matter which subsection is invoked.

 It is also clear that the First Amendment does not protect copyright infringement. *See Harper & Row, Publs., Inc. v. Nation Enters.*, 471 U.S. 539, 555–60, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Zacchini v. Scripps–Howard*, 433 U.S. 562, 574–78, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). Moreover, the Supreme Court recently confirmed in *Eldred v. Ashcroft* that the proximity of the Copyright Clause and the First Amendment demonstrates "the Framers' view [that] copyright's limited monopolies are compatible with free speech principles," and that copyright serves to promote First Amendment ideals as " 'the engine of free expression.' " 123 S.Ct. at 788 (quoting *Harper & Row*, 471 U.S. at 558, 105 S.Ct. 2218). The Court noted "built-in First Amendment accommodations" in copyright law, including the distinction between ideas and expression and the "fair use" doctrine, which it found "are generally adequate to address" First

17. Verizon devotes only two sentences and a footnote to the constitutional issues, contending that the subsection (h) subpoena authority, if broadly construed, raises substantial Article III (judicial power) and First Amendment (freedom to engage in anonymous speech) questions. *See* Verizon Opp. at p. 4.

18. RIAA and Verizon have acknowledged that Verizon may not have standing to raise a challenge to the subpoena based on the user's alleged First Amendment or other constitutional interests. The Court need not address that issue here.

Amendment concerns relating to asserted rights to use the speech of others. *Id.* at 788–89; *see Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74 (2d Cir.1999) ("We have repeatedly rejected First Amendment challenges to injunctions from copyright infringement on the ground that First Amendment concerns are protected by and coextensive with the fair use doctrine."). Here, of course, the various protections incorporated into subsection (h), and discussed *supra*, further guard against First Amendment concerns.

■ Nor is this an instance where the anonymity of an Internet user merits free speech and privacy protections. Certainly, the Supreme Court has recognized that, in some situations, the First Amendment protects a speaker's anonymity. *See, e.g., Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 2090, 153 L.Ed.2d 205 (2002) (municipal ordinance requiring pamphleteers to disclose names implicates "anonymity interests" rooted in the First Amendment); *Buckley v. Am. Constitutional Law Foun., Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (state requirement forcing petitioners to wear identification badge violated First Amendment because it infringed on petitioners' anonymity); *McIntyre v. Ohio Elections Comm.*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (the right to speak anonymously "exemplifies the purpose behind the Bill of Rights, and the First Amendment in particular"). Lower federal courts have specifically recognized that the First Amendment may protect an individual's anonymity on the Internet. *See, e.g., Doe v. 2TheMart.Com, Inc.*, 140 F.Supp.2d at 1097 ("the constitutional rights of Internet users, including the

right to speak anonymously, must be carefully safeguarded"); *ACLU v. Johnson*, 4 F.Supp.2d 1029, 1033 (D.N.M.1998), *aff'd*, 194 F.3d 1149 (10th Cir.1999) (upholding First Amendment right to communicate anonymously over the Internet); *ACLU of Georgia v. Miller*, 977 F.Supp. 1228, 1230 (N.D.Ga.1997) (recognizing constitutional right to communicate anonymously and pseudonymously on the Internet). The Internet and Worldwide Web provide an unprecedented electronic megaphone for the expression of ideas and an unparalleled opportunity for a national—even international—town square for expression. *See, e.g., Reno v. ACLU*, 521 U.S. 844, 853, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) ("Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox.").

■ But neither Verizon nor any *amici* has suggested that anonymously offering for downloading more than 600 songs over the Internet without authorization is protected expression under the First Amendment.[19] To be sure, this is not a case where Verizon's customer is anonymously using the Internet to distribute speeches of Lenin, Biblical passages, educational materials, or criticisms of the government—situations in which assertions of First Amendment rights more plausibly could be made. As the Supreme Court explained in *Watchtower Bible & Tract Society*, the purpose of protecting anonymous expression is to safeguard those "who support causes anonymously" and those who "fear economic or official retaliation," "social ostracism," or an unwanted intrusion into "privacy." 122 S.Ct. at 2089. The materials RIAA alleges are being infringed include more than 600 copyrighted

19. RIAA notes, moreover, that the alleged infringer is not truly anonymous—Verizon knows the identity.

recordings by well-known artists. RIAA has shown that the copyright owners have not authorized such use; moreover, the fact that these copyrighted materials were shared over the peer-to-peer software of KaZaA only reinforces the belief that copyrights are being infringed. There is no evidence, or even suggestion, in the record to indicate that downloading or transmitting these recordings is somehow protected expression.[20]

Interestingly, Verizon's argument that a copyright owner seeking to obtain information about an alleged infringer should use a John Doe action undercuts the contention that the DMCA subpoena process violates the Internet user's right to anonymity. The First Amendment problems, if any, would be the same in either litigation setting, and the user could assert its rights and objections to either subpoena.[21] Hence, if the John Doe action alternative poses no First Amendment issue, the sub-

section (h) subpoena process does not either.

The Court does not, however, resolve the constitutional issues identified by Verizon and several *amici*. Absent a clear challenge by Verizon, and full briefing and development by the parties, it is not appropriate to do so. But certainly the issues raised do not reveal an obviously fatal constitutional flaw in the subpoena process available under the DMCA.[22]

### CONCLUSION

Based on the text and structure of the Digital Millennium Copyright Act, as confirmed by the purpose and history of the Act, the Court concludes that the subpoena authority of section 512(h) applies to all service providers within the coverage of the Act, including Verizon and other service providers falling within subsection (a). With copyright legislation such as the DMCA, "[t]he wisdom of Congress' action

---

**20.** The Ninth Circuit has twice upheld injunctions ordering a defendant to disable its file transferring service and shut down the service, without finding any First Amendment violation. *See A & M Records, Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir.2002); *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir.2001) ("First Amendment concerns in copyright are allayed by the presence of the fair use doctrine" and "[u]ses of copyrighted material that are not fair uses are rightfully enjoined"). This Court, however, is not being asked to enjoin the peer-to-peer software used here; litigation against KaZaA is proceeding in other courts across the country. All that is at issue here is the identity of the apparent infringer using Verizon's system, and whether the DMCA requires Verizon to produce that limited information.

**21.** The *amici* also challenge the subsection (h) subpoena power on the ground that under Article III of the Constitution there must be a "case or controversy" before the Court to provide jurisdiction to issue a subpoena. Again, Verizon has made it clear that it is not raising an Article III challenge to the DMCA, but only noting a "policy consideration" rele-

vant in interpreting the DMCA, and there has been no briefing on this issue by the parties. *See* Tr. of Hearing (Oct. 4, 2002) at p. 61. Of course, the DMCA includes a provision in subsection (h)(6) requiring that the issuance and enforcement of subpoenas "shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." That protection ensures that service providers served with subpoenas can resort to the Federal Rules, including Fed.R.Civ.P. 45, which specifically addresses subpoena enforcement and the rules for quashing a subpoena.

**22.** Arguably, a First Amendment challenge by Verizon would be facial rather than as applied, and thus it would have to be shown that in virtually every application the DMCA offends the First Amendment by requiring the production of the identity of an anonymous user. *See United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). That is a heavy burden for Verizon to satisfy.

... is not within [the Court's] province to second guess." *Eldred v. Ashcroft*, at 790. Therefore, the Court grants RIAA's motion to enforce its subpoena, and orders Verizon to comply with the subpoena. A separate order has been issued on this date.